789 F.2d 1460
 122 L.R.R.M. (BNA) 3066, 104 Lab.Cas. P 11,968,
Bankr. L. Rep. P 71,116
 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA, Teamsters National
Freight Industry Negotiating Committee and International
Association of Machinists and Aerospace Workers, Appellants,
v.
IML FREIGHT, INC., a Utah corporation, Debtor/Appellee.
 No. 84-2063.
 United States Court of Appeals,
Tenth Circuit.
 April 30, 1986.
 
 1
 Frederick Perillo of Goldberg, Previant, Uelmen, Gratz, Miller & Brueggeman, S.C., Milwaukee, Wis., for appellants.
 
 
 2
 Robert L. Stevens (William S. Richards, with him on briefs) of Richards, Brandt, Miller & Nelson, Salt Lake City, Utah, for debtor/appellee.
 
 
 3
 Before LOGAN and SEYMOUR, Circuit Judges, and MATSCH, District Judge.*
 
 
 4
 MATSCH, District Judge.
 
 
 5
 This is an appeal from a decision of a district court affirming a bankruptcy judge's order granting the petition of a debtor-in-possession, IML Freight, Inc. ("IML"), to reject its collective bargaining agreements with the unions representing most of its employees. The bankruptcy judge's order was entered before the Supreme Court decided NLRB v. Bildisco & Bildisco, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). After the Bildisco decision, Congress enacted Pub.L. No. 98-353, amending the Bankruptcy Code to establish a procedure for and the conditions under which collective bargaining agreements may be rejected. 11 U.S.C. Sec. 1113. This statute "adheres to the spirit of [the] unanimous Supreme Court opinion." Statement by the Hon. Orrin G. Hatch on H.R. 5174, 98th Cong., 2d Sess. (June 29, 1984), reprinted in 1984 U.S.Code Cong. & Ad.News 576, 592. While new procedural requirements have been imposed, the approach to the required balancing of the equities should not be different from the instruction provided in Bildisco. Section 1113 is not applicable to any cases commenced prior to July 10, 1984, and does not affect this appeal. It is appropriate, however, to observe that the special nature of labor contracts is rooted in the national policy which favors collective bargaining in employment and that Congress has strongly cautioned the bankruptcy courts to be considerate of that policy.
 
 
 6
 On July 15, 1983, IML filed a petition for voluntary reorganization under Chapter 11, and the bankruptcy court authorized the company to continue its business as debtor-in-possession. On the same date, IML filed a petition to reject the subject 33 collective bargaining agreements, with 66 local unions. On August 11, 1983, the bankruptcy judge orally granted the petition to reject those executory contracts, followed by a written order entered on August 11, 1983. Sometime thereafter the employees went on strike, and IML went into Chapter 7. The district court affirmed the bankruptcy judge by an order of June 25, 1984.
 
 
 7
 The appellants, the Teamsters National Freight Industry Negotiating Committee and the International Association of Machinists and Aerospace Workers ("the unions") contend that the district court erred in affirming the rejection of the contracts. The trustee in bankruptcy is here as appellee, defending the position taken by IML in its role as debtor-in-possession. This appellate court must accept the findings of the bankruptcy judge unless they are clearly erroneous. In re Reid, 757 F.2d 230, 233 (10th Cir.1985).
 
 
 8
 While the bankruptcy judge did not have the benefit of the Supreme Court's opinion in Bildisco, this court must apply the standards established in that case as stating the applicable law. The unions concede, however, that it would be unfair to reverse for a failure to follow the admonition that reasonable efforts to negotiate an agreement with the unions is a condition precedent to consideration of a petition to reject these contracts.
 
 
 9
 Collective bargaining agreements are executory contracts within the meaning of 11 U.S.C. Sec. 365, and the bankruptcy court may permit rejection upon a showing by the debtor-in-possession that the collective bargaining agreement burdens the estate, and that after careful scrutiny the equities balance in favor of rejection. Bildisco, 465 U.S. at 525-26, 104 S.Ct. at 1196-97. The bankruptcy judge has a special responsibility in these cases to make detailed findings to support a conclusion that rejection is warranted.
 
 
 10
 Since the policy of Chapter 11 is to permit successful rehabilitation of debtors, rejection should not be permitted without a finding that that policy would be served by such action. The Bankruptcy Court must make a reasoned finding on the record why it has determined that rejection should be permitted.
 
 
 11
 Id. at 527, 104 S.Ct. at 1197 (emphasis added).
 
 
 12
 It is not enough to find that the contracts are so burdensome that performance would result in liquidation. A "doomsday" argument should not be controlling. The bankruptcy judge must carefully consider the consequences of liquidation for the debtor, the reduced value of the creditors' claims following affirmance, and the impact of rejection on the employees. Most importantly, the question is more than a matter of business judgment. The equities must be balanced among all parties in interest, and the controlling question is whether the hardships imposed are outweighed by a reasonable expectation of successful reorganization.
 
 
 13
 The bankruptcy judge concluded that liquidation was inevitable without rejection of the contracts, and that the presumed savings were the only available source of the massive relief necessary for the debtor's survival.
 
 
 14
 We are unable to review that ultimate conclusion because there are insufficient findings of fact to support it. There is no finding on the record concerning the relative or absolute amount of the debtor's salary expense compared with the cost of the union employees' wages and benefits. Equitable considerations are important here, and the bankruptcy judge must make findings to support a debtor's unequal treatment of its union employees. A finding that the debtor's salaried employees are being paid "below market" (R., Vol. IX at 9.), is insufficient to justify the conclusion that a reduction in the pay of salaried employees will not assist reorganization. The union employees, because of a voluntary wage loan back program, were also being paid "below market". The relevant inquiry is whether the balance of equities favors the rejection of the labor contracts.
 
 
 15
 The debtor's expert witness, Dr. Tannenbaum, testified that only by rejecting these contracts and paying 25-30% less to union employees could IML survive. (R., Vol. IV at 40-58.) The chief financial officer for IML, Mr. Price, testified that IML would run out of money between five and nine weeks after the end of July, 1983, unless the contracts were rejected. (R., Vol. VI at 45.) The unions' expert witness, Dr. Weintraub, gave contrary opinions, including testimony concerning inefficient use of the work force and a cost comparison with the company's competitors. The unions also presented evidence tending to show disproportionate expenditures for the salaries of supervisors and other non-bargaining unit expenditures. Neither the bankruptcy judge nor the district court made any reference to this evidence in making the conclusory findings in this record. The bankruptcy judge did not address the issue of the effect of affirmation upon other creditors' claims. No finding is on the record to indicate who the other creditors are, much less how the potential liquidation would affect them.
 
 
 16
 One of the unusual aspects of this case is that the bargaining unit employees constituted a major class of creditors because the company owed them approximately $11.7 million under various wage loan programs. The bankruptcy judge noted that fact and considered the employees as unwilling "partners of debtor in its need to succeed." (R., Vol. IX at 8-9.)
 
 
 17
 The bankruptcy judge concluded that without rejection the employees would lose their jobs. But there is little discussion of the effect on employees from rejection. While there is an indication that both the bankruptcy judge and district judge were aware that the employees would probably strike after rejection, the reality of the unions' strongly stated opposition was dismissed with an expression of hope that the debtor would reach an accommodation with its employees. Such optimism would scarcely seem warranted in view of the pre-bankruptcy history, including unfair labor practice charges following unilateral wage cuts.
 
 
 18
 Most significantly, both the bankruptcy judge and the district court failed to recognize that the rejections could generate burdensome claims against the estate. The rejection of any executory contract constitutes a breach of that contract under 11 U.S.C. Sec. 365(g), which breach relates back to the date immediately before the filing of the bankruptcy petition. Bildisco, 465 U.S. at 530-31, 104 S.Ct. at 1198-99. Accordingly, claims may be filed for all losses attributable to the non-performance of the contracts, including payments due to all fringe benefit plans, loss of seniority rights, and all other provisions of the agreements. 11 U.S.C. Sec. 502(g) provides:
 
 
 19
 A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.
 
 
 20
 Section 502(c) requires that such unliquidated claims must be estimated for allowance if liquidation of the claim would unduly delay closing of the case. Prior law would permit disallowance in that circumstance. The Supreme Court took note of these consequences from rejection in Bildisco, 465 U.S. at 530 nn. 11-12, 104 S.Ct. at 1198-99 nn. 11-12. Moreover, some of those claims may be entitled to priority in payment. See 11 U.S.C. Sec. 507. There is an anomaly in the bankruptcy judge's consideration of a possible exposure of $30 million for "withdrawal liability" for health, welfare and pension plans as an inducement to the debtor to negotiate a new agreement without recognizing the potential for the same liability as a direct result of the order permitting rejection of the existing contracts.
 
 
 21
 The fundamental flaw in the proceedings under review can best be summarized by a quotation from appellee's brief. In asserting that the unions had mischaracterized the bankruptcy judge's approach by arguing that he was insisting that only the union employees must sacrifice for the continued existence of IML, appellee's counsel wrote:
 
 
 22
 The only matter at issue before Judge Clark was whether or not the contracts involved should be rejected. The issue as to whether other contracts should be rejected, the plan or [sic] reorganization itself, and all other issues regarding cost-cutting and efficiency, were not before Judge Clark at the time, and consequently not dealt with in his Order. The ruling did recognize, however, that in view of the fact that only the union employees could save the company, the choice was in their hands as to whether the company could continue to exist or not.
 
 
 23
 Appellee's Brief at 28. The question must not be considered in such a narrow focus. The bankruptcy judge referred to In re Brada Miller Freight System, Inc., 702 F.2d 890 (11th Cir.1983) in his ruling in this case, specifically citing footnote 35 (concerning the lack of relevance of past management practices), but he failed to consider the court's caution that many factors must be considered in striking an appropriate balance among the important policies involved in the question of rejecting this special type of executory contract. Brada Miller was among the cases cited with approval in the Supreme Court opinion in Bildisco, 465 U.S. at 523, 104 S.Ct. at 1195.
 
 
 24
 Finally, this proceeding is a clear demonstration of the wisdom in the following ruling in Bildisco:
 
 
 25
 Before acting on a petition to modify or reject a collective-bargaining agreement, however, the Bankruptcy Court should be persuaded that reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution. The NLRA requires no less. Not only is the debtor-in-possession under a duty to bargain with the union under Sec. 8(a)(5) of the NLRA, 29 U.S.C. Sec. 158(a)(5), see infra, at 534 [104 S.Ct. at 1201], but the national labor policies of avoiding labor strife and encouraging collective bargaining, Sec. 1, NLRA, 29 U.S.C. Sec. 151, generally require that employers and unions reach their own agreements on terms and conditions of employment free from governmental interference.
 
 
 26
 465 U.S. at 526, 104 S.Ct. at 1196.
 
 
 27
 Congress has now made such negotiations a condition precedent to the filing of an application seeking rejection of a collective bargaining agreement in 11 U.S.C. Sec. 1113(b).
 
 
 28
 While we have agreed with appellants that it would be unfair to give retroactive application to that requirement in Bildisco, and that the statutory change is not applicable, it is clear that the bankruptcy judge followed a converse course of reasoning. He concluded that rejection would cause negotiation leading to a new contract. That approach is inconsistent with the history of judicial intervention in labor disputes since the formation of labor organizations in the United States. It is also inconsistent with the court's duty to balance the equities.
 
 
 29
 It is the view of this court that the bankruptcy judge and district court failed to make the required findings of fact to support the conclusion that the labor agreements should be rejected. Accordingly, the decision of the district court approving rejection of IML's labor agreements is REVERSED and this matter is REMANDED for further proceedings.
 
 
 
 *
 Honorable Richard P. Matsch, United States District Judge for the District of Colorado, sitting by designation