PER CURIAM.
“Third-party defendants Kevin M. Abel and Abel & Busch, Inc. (Abel) appeal from an order of the United States District Court for the Western District of Oklahoma affirming a decision of the bankruptcy court that (1) approved in limited amount Abel’s proof of claim for attorney’s fees due in connection with services rendered under a pre-petition contract with plaintiff Landsing Diversified Properties, II (LDP), his former client, and (2) enjoined Abel from collecting the remainder of the claimed fee from a third party in state court under Oklahoma’s attorney’s lien provisions, Okla.Stat. tit. 5, §§ 6-9 (West 1984).
The origins of this case reach back to late 1983 and 1984, when two transformers maintained by Public Service Company of Oklahoma (PSO) exploded, causing substantial damage to an LDP facility. LDP retained Abel to pursue litigation against PSO. The retainer agreement provided for a hybrid form of compensation, consisting of a reduced hourly fee supplemented with a reduced contingency fee. In December of 1984, Abel filed suit for LDP against PSO and, eventually, obtained a settlement offer of $3 million. In the meantime, Abel secured his contract fee by filing an attorney’s lien under state law.
In September of 1986, LDP petitioned for bankruptcy under Chapter 11. Several months later, LDP filed an adversary proceeding against First National Bank and Trust Company of Tulsa (FNB), which held a mortgage on the damaged LDP property, to determine the relative priority of their rights in any potential settlement of the suit against PSO. Abel was subsequently brought into the proceeding as a third-party defendant to resolve what rights, if any, he would have in PSO settlement proceeds, and his outstanding proof of claim against LDP for attorney’s fees was consolidated as well.
Following a hearing on March 20, 1986, the bankruptcy court made several preliminary determinations regarding the existence and nature of Abel’s attorney’s lien and associated fees claim against LDP. First, the bankruptcy court held that the lien survived the filing of LDP’s Chapter 11 petition and would also remain intact should LDP formally reject its pre-petition retainer agreement with Abel under 11 U.S.C. § 365 (assumption and rejection of *595 executory contracts). The court denied LDP’s objection to Abel's claim for hourly fees under the agreement for both pre- and post-petition work, reserving calculations for a later time. The court further held that in the event the retainer agreement was affirmed by LDP, Abel would also be entitled to recover a share of any PSO settlement under the retainer’s (contingency fee) terms, subject only to objections regarding excessiveness under 11 U.S.C. § 502(b)(4). Finally, however, the court held that should LDP reject the retainer agreement, Abel’s recovery, if any, in this regard would be determined (i. e., limited) by quantum meruit principles. Shortly thereafter, LDP rejected the retainer agreement and discharged Abel.
In October of 1987, the PSO litigation settled. PSO paid LDP and FNB a sum in excess of its previous offer, unreduced by any fee owing to Abel. In return, LDP and FNB agreed to indemnify PSO should it be held liable to Abel for ignoring his attorney’s lien. Abel has since filed suit against PSO in state court pursuant to Okla.Stat. tit. 5, §§ 6-9, to recover whatever portion of his fee remains unsatisfied in this Chapter 11 proceeding. The injunction issued against Abel with respect to this ancillary state court action will be taken up following our review of the disposition of Abel’s claim for fees against LDP.
The bankruptcy court’s final order in this matter was entered on August 24, 1988. The court basically adhered to the analysis indicated in its preliminary rulings, approving some remaining hourly fees sought by Abel but rejecting his contingency fee claim to twenty-five percent of either the $3-million settlement offer he had obtained from PSO or the actual value of the settlement ultimately reached. The latter claim was essentially treated instead as a request for an enhancement over the (reduced) hourly fee already approved. The court considered the lodestar figure reasonable compensation for the services rendered and, accordingly, deemed enhancement inappropriate. On appeal, the district court concurred in the bankruptcy court’s determination of Abel’s claim and affirmed. Because, as explained in detail below, the analytical process followed by the bankruptcy court contravened the controlling statutory provisions, we reverse.
Underlying the bankruptcy court’s approach is the premise that the contingency portion of Abel’s pre-petition fee contract did not survive rejection of the contract by LDP, leaving Abel nothing to stand on in this regard except equitable principles. But the legal rights and obligations created by the various provisions of a contract cannot simply be ignored upon rejection by the trustee of any'remaining executory portion. On the contrary, under 11 U.S.C. § 365(g), the rejection of an exec-utory contract “constitutes a breach of that contract” (emphasis added), for which damages ordinarily allowed in contract are available. See International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers v. IML Freight, Inc., 789 F.2d 1460, 1463 (10th Cir.1986); Leasing Serv. Corp. v. First Tenn. Bank Nat’l Ass’n, 826 F.2d 434, 436 (6th Cir.1987); In re Cochise College Park, Inc., 703 F.2d 1339, 1351-53 (9th Cir.1983); In re Murphy, 694 F.2d 172, 174 (8th Cir.1982). Since a pre-petition contingency fee agreement between the debtor and an attorney is, with one exception to be discussed shortly, “like any other contract claim against the estate,” In re Yermakov, 718 F.2d 1465, 1470 (9th Cir.1983), Abel was legally entitled to full contract damages rather than the court’s discretionary award of an equitable fee.
The source of allowable contract damages in this context, as in bankruptcy in general, is state law. See, e.g., In re Pacific Far E. Line, Inc., 654 F.2d 664, 668-70 (9th Cir.1981); see also In re Community Medical Center, 623 F.2d 864, 866 (3d Cir.1980). See generally In re James E. O’Connell Co., 799 F.2d 1258, 1260-61 (9th Cir.1986). In Oklahoma, contingency fee contracts of fifty percent or less are valid and enforceable. See Okla.Stat. tit. 5, § 7; see, e.g., State ex rel. Howard v. Oklahoma Corp. Comm’n, 614 P.2d 45, 49 n. 5 (Okla.1980); Town of Mannford v. Watson, 394 P.2d 506, 509 (Okla.1964). More to the point, when a client eircum- *596 vents such an agreement by settling litigation in a manner excluding counsel’s participation, counsel may still recover his contractual contingency fee. See, e.g., Walker v. Telex Corp., 583 P.2d 482, 484, 485 (Okla.1978); Mayor v. Wilkerson, 188 Okl. 600, 111 P.2d 1069, 1070-72 (1941); Mathews v. Smith, 169 Okl. 518, 39 P.2d 48, 49, 53 (1934); Callahan v. Cowley & Riddle, 117 Okl. 58, 245 P. 48, 50 (1926). Indeed, as Abel has pointed out, even where circumstances beyond the client’s control (counsel’s death) precluded counsel’s participation in the conclusion of settlement, contingency fee compensation was awarded, as the reasonable value of counsel’s services, in City of Barnsdall v. Curnutt, 198 Okl. 3, 174 P.2d 596, 600 (1945).
Considerable additional authority for Oklahoma’s recognition of contingency fee damages in this context is supplied by appellees. They cite White v. American Law Book Co., 106 Okl. 166, 233 P. 426 (1924), as the source of Oklahoma’s rule that an attorney discharged without fault by a client prior to final resolution of the subject matter of their relationship is entitled to his bargained-for compensation, “even though the agreement was for a contingency fee, provided the contingency has taken place.” Id., 233 P. at 427. Appellees consider this proposition favorable to them because they misread the final conditional phrase as “provided the contingency ha[<i] taken place [prior to the discharge ].” But if the contingency must necessarily have occurred prior to the discharge for this particular rule to apply, the rule would be utterly superfluous — ordinary principles of contractual obligation would entitle the fully performing attorney to his fee. Moreover, the very case cited by White for the quoted proposition, Dolph v. Speckart, 186 P. 32 (Ore.1920), specifically held that an attorney who procured a settlement offer (rejected by the client), and who was fired before the client obtained a favorable judgment with the assistance of other counsel, was nevertheless entitled to a contingency fee. Id. at 35. The same is true of Bartlett v. Odd Fellows’ Sav. Bank, 79 Cal. 218, 21 P. 743, 744 (1889), one of the “cases cited therein [in Dolph ]” derivatively relied upon by White. See White, 233 P. at 427. Furthermore, despite appellees’ attempt to distinguish the similar holding of Okmulgee Bldg. & Loan Ass’n v. Cutler, 174 Okl. 614, 51 P.2d 709 (1935), on the basis of facts not relied upon by the court,[1] the case stands as a reaffirmation of the controlling principle already established in White: “Where an attorney is employed at an agreed [contingent] compensation and fully performs his agreement until discharged without cause, the measure of his damages is the compensation named in the contract.” (Emphasis added.) Id. at 710-11 (quoting White, 233 P. at 426 (second headnote of syllabus)). Finally, First Nat’l Bank & Trust Co. v. Bassett, 183 Okl. 592, 83 P.2d 837 (1938) (quantum me-ruit compensation sought by and awarded to attorney who had worked but secured no settlement offer on cases that were reduced to judgment by other counsel thirteen years after his discharge by client), is so factually remote that it is not of any analytical use here.
In light of the foregoing authorities, we do not think Oklahoma has embraced or will embrace appellees’ implausible view that a client whose attorney has already secured a favorable settlement offer can unilaterally reduce counsel’s bargained for contingency fee to a (much smaller) hourly *597 quantum meruit recovery simply by breaching their fee agreement before settling the litigation counsel had been employed on.
That is not the end of the matter, however, since 11 U.S.C. § 502(b)(4) places an outside “reasonable value” limitation on Abel’s claim for breach of his fee contract with LDP.[2] While, as already noted, state law determines the available contract damages arising from breach of a legal services agreement for purposes of section 365(g), at the subsequent stage in the analysis mandated by section 502(b)(4) a federal standard should guide the court in its judgment regarding the reasonableness of such damages in the context of bankruptcy. Cf. In re Hudson Shipbuilders, Inc., 794 F.2d 1051, 1056-58 (5th Cir.1986); In re 268 Ltd., 789 F.2d 674, 675-77 (9th Cir.1986). But see In re Morse Tool, Inc., 87 B.R. 745, 748-50 (Bankr.D.Mass.1988) (criticizing 268 Limited; state law controls). The cited cases involve determinations by the bankruptcy court under provisions authorizing the court’s calculation of a reasonable fee in the first instance rather than its post facto assessment of the reasonableness of an already fixed fee, compare 11 U.S.C. § 330(a)(1) and § 506(b) with section 502(b)(4), but we see no reason to read the cap on allowed claims in section 502(b)(4) as peculiarly prescribing the incongruous and somewhat circular use of state attorney’s fee standards to evaluate the bankruptcy appropriateness of claims already calculated in connection with the same state principles.
To summarize, then, the analysis of Abel’s claim should have proceeded through the following sequence: (1) Acknowledgment of LDP’s breach of its hybrid hourly/contingeney fee contract with Abel under section 365(g); (2) assessment of damages under applicable Oklahoma law, which would allow not only for the unpaid hourly fees but also for loss of the supplementary contingency fee; (3) determination, under section 502(b)(4) and attendant federal bankruptcy standards, of the reasonableness of the damages claim afforded Abel by state law; and (4) reduction of Abel’s claim by whatever extent, if any, it is deemed excessive. Instead of adhering to this model, the bankruptcy court apparently misread the effect of section 365(g) on the contingency provision, consequently bypassed the succeeding steps in the analysis, and simply determined for itself in the first instance a reasonable hourly fee for Abel under the traditional lodestar method. At this point, though, one might wonder what is the difference — did not the bankruptcy court merely save some time by asking the dis-positive reasonableness question up front? There is a critical difference, however, and it rests on the nature of the reasonableness question asked under the two approaches.
The analytical shortcut taken by the bankruptcy court would be permissible if under federal law there were only one reasonable fee for any given case. Pursuant to such an assumption, the question of whether any fee permitted by state law was (federally) reasonable would simply collapse into the question, asked and answered by the bankruptcy court, of what is the reasonable fee for the services rendered. For those otherwise unable to afford representation, however, the matter of funding legal representation is not so restrictive. Contingency agreements and their hybrid offspring provide reasonable alternatives to the hourly retainer, despite the fact that, as a result of their contingent and therefore risky nature, such agreements typically generate fees (if at all) substantially in excess of their more conservative counterparts.[3] Thus, in other *598 settings where the bankruptcy court has ignored a debtor’s reasonable contingency fee obligation and, instead, substituted its own determination of a (much lower) reasonable hourly fee, appellate courts have reversed and directed payment in accordance with the terms of the contingency fee agreement. See, e.g., Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A., 778 F.2d 890, 894-99 (1st Cir.1985); In re Innkeepers of New Castle, Inc., 671 F.2d 221, 227-30 (7th Cir.), cert. denied, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982).
In short, then, the bankruptcy court asked and answered the wrong reasonableness question (not the right question at the wrong time), and its divergence from the statutorily prescribed analysis may well have cost Abel the benefit of his contingency fee bargain.[4] While appellate courts generally defer to fee determinations by the bankruptcy court, see, e.g., Boston & Maine, 778 F.2d at 894; In re Nucorp Energy, Inc., 764 F.2d 655, 657 (9th Cir.1985), the error identified here involves misapplication of statutory provisions, i.e., is one of law, and therefore warrants de novo correction even under the otherwise deferential authorities cited. See also Bartmann v. Maverick Tube Corp., 853 F.2d 1540, 1543 (10th Cir.1988) (appellate review of legal questions in bankruptcy is de novo); In re Aslan, 909 F.2d 367, 370 (9th Cir.1990) (determinations concerning the effect of contract rejection under section 365 are conclusions of law subject to de novo review). Accordingly, we reverse the bankruptcy court’s direct assessment of a reasonable fee for Abel’s pre-petition services and remand for a determination of Abel’s contract damages subject to the ceiling imposed by section 502(b)(4).
We turn now to the injunctive relief granted at appellees’ request against Abel. As noted earlier, and candidly admitted by Abel, he has filed a state attorney’s lien action against PSO under Okla.Stat. tit. 5, §§ 6-9 to protect the same settlement-fee entitlement claimed herein from LDP. There is nothing necessarily duplicitous in pursuing such redundant remedies. Oklahoma law recognizes the concurrent liability of the nonpaying client under common law and the settling adverse party under statute in the present context. See Callahan, 245 P. at 49-50. While these two causes of action may be joined, see Mayor, 111 P.2d at 1070-71, and payment by either defendant in full satisfaction of the obligation obviously bars (double) recovery against the other, see Callahan, 245 P. at 50, nothing precludes assertion of these claims in different legal proceedings.
The bankruptcy court permanently enjoined Abel from further prosecution of his state action against PSO, conditioned only on timely payment of the diminished fee claim allowed against LDP. The court had to rely upon its broad equitable power under 11 U.S.C. § 105(a) (“The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]”) as the source of its authority to issue the injunction, because LDP was not a party to the state action, see 11 U.S.C. § 362(a)(1) (automatic stay of proceedings “against the debtor”), LDP’s property also was not involved, see 11 U.S.C. § 362(a)(3) (automatic stay of “any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate”), and the injunction was expressly intended to continue in effect following conclusion of the bankruptcy proceeding, see 11 U.S.C. § 362(c) (automatic stay expires when case is closed, proceeding is dismissed, or a discharge is granted or denied). We must first determine the *599 permissibility of this exercise of equitable authority as it relates to the temporary, interim protection of the reorganization process, before moving on to consider the less immediate but more important question regarding the validity of its contemplated post-confirmation, permanent enforcement.
It is hornbook law that “[ajctions and conduct excepted from the automatic stay may be subject to specific injunctive relief under § 105(a).” 2 Collier on Bankruptcy par. 105.02 at 105-6 (15th ed. 1990). Collier observes that “[sjection 105(a) has been widely utilized in attempts to enjoin court proceedings against nondebtor parties that allegedly will have an impact on the debt- or’s bankruptcy case,” and comments that such attempts require “case by case decisions as to whether any particular action excepted from the automatic stay will result in sufficient harm or interference with the bankruptcy case to warrant the issuance of a specific injunction.” Id. at 105-7 to -9.
The Fourth Circuit has evolved a fairly well-developed approach to section 105(a) stays requested by debtors seeking to restrain extra-bankruptcy actions against third parties on the ground that the bankruptcy process will somehow be burdened or impaired as a consequence thereof. Under this approach, such factors as a unity of interest between the debtor and the threatened third party, an indemnification obligation owing from the former to the latter, or simply the debtor’s inevitable, burdensome involvement in the ancillary litigation can justify preemptive injunctive relief. See, e.g., In re A.H. Robbins Co., 828 F.2d 1023, 1025-26 (4th Cir.1987), cert. denied, 485 U.S. 969, 108 S.Ct. 1246, 99 L.Ed.2d 444 (1988); A.H. Robbins Co. v. Piccinin, 788 F.2d 994, 999-1002 (4th Cir.), cert. denied, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). Some other circuits have indicated or implied basic agreement with the Fourth Circuit’s approach, while noting certain case-specific reservations. See, e.g., In re American Hardwoods, Inc., 885 F.2d 621, 622-23, 624-27 (9th Cir.1989); Dennis v. A.H. Robbins Co., 860 F.2d 871, 872-73 (8th Cir.1988). But see Lynch v. Johns-Manville Sales Corp., 710 F.2d 1194, 1196-1200 (6th Cir.1983) (pre-Picci-nin case denying stay under similar circumstances despite recognition that claims for indemnification and contribution against debtor could arise out of nonstayed litigation). Still other courts have cited section 105(a) and similarly recognized its broad protective purpose as an alternative or supplemental rationale when staying litigation against a debtor’s liability insurer primarily under section 362(a)(3) (the insurance policy being considered the requisite “property of the estate” for invocation of the latter, more specific statutory authority). See, e.g., MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 93-94 (2d Cir.), cert. denied, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988); In re Davis, 730 F.2d 176, 183-84 (5th Cir.1984).
Appellees argue that LDP’s agreement to indemnify PSO is sufficient to justify the stay issued below. However, LDP’s obligation in this regard is not exclusive or complete. The parties’ settlement agreement actually requires FNB to reimburse PSO for sixty percent of any recovery Abel obtains in the state suit. The authorities discussed above do not support the issuance of an injunction with respect to state proceedings brought against a non-debtor who simply may seek indemnification from yet another nondebtor.
Accordingly, while a temporary injunction against Abel’s pursuit of PSO funds subject to indemnification by LDP may be warranted during pendency of this bankruptcy proceeding, this relief should not extend to litigation over sums for which PSO may look to FNB for reimbursement. Whatever minor involvement, if any, LDP might have in such an isolated, limited context is not the kind of substantial burden sufficient to justify a stay against Abel’s enforcement of his statutory rights against PSO. Cf. In re A.H. Robbins Co., 828 F.2d at 1026; See generally Dennis, 860 F.2d at 872-73.
In addition to relieving the perceived burden on LDP, the bankruptcy court granted the stay to prevent Abel from getting a *600 “second bite at the apple” on his fees entitlement, which the court concluded “would be in derogation of this court’s determination in this regard [and] would undermine the policies and provisions of the Bankruptcy Code permitting and requiring the determination of such issues by this court....” Bankruptcy Court Order Filed August 24, 1988, at 18 (R.Vol. 2, Doc. 68). However, Abel’s pursuit of the balance of his unpaid contingency fee under his statutory lien against PSO should not in any way undercut or involve a redetermination of the bankruptcy court’s decision to limit Abel’s allowed claim against the debtor under section 502(b)(4), a matter that is plainly beyond the bounds of state court authority or concern. Consequently, the only viable justification for the temporary injunction rests on the need to protect LDP during preparation and confirmation of a reorganization plan and, as we have seen, this rationale is limited to that portion of Abel’s potential recovery from PSO for which LDP may be held responsible.
The second and more serious problem with the injunction is its explicitly permanent nature. The injunction was not issued merely to limit and simplify the legal entanglements of the debtor during development and evaluation of a reorganization plan, but also clearly to control in perpetuity the post-confirmation status of Abel’s claim against PSO. By permanently enjoining Abel’s action against PSO, the bankruptcy court, in essence, discharged PSO’s liability to Abel under state lien law as effectively as it discharged LDP’s contractual debt to Abel under federal bankruptcy law. For the reasons that follow, we hold such a permanent injunction precluding Abel’s attempt to recover any unpaid portion of his fee from PSO to be improper, regardless of who has agreed to indemnify PSO. The significance of LDP’s partial obligation in this regard is limited solely to the question of the bankruptcy court’s authority to issue a temporary injunction against Abel to protect the debtor and the bankruptcy process until confirmation of a reorganization plan — after which LDP’s obligation will be discharged and LDP protected by the “fresh start” injunc-tive provision of 11 U.S.C. § 524(a), which basically prevents anyone from pursuing the debtor on a discharged debt, including third parties such as PSO who may seek reimbursement from the debtor through indemnification, contribution, subrogation, etc., for their satisfaction of the same debt.[5]
While section 524(a) thus affords broad benefits to the debtor, “discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.” 11 U.S.C. § 524(e). Obviously, it is the debtor, who has invoked and submitted to the bankruptcy process, that is entitled to its protections; Congress did not intend to extend such benefits to third-party bystanders. See 3 Collier on Bankruptcy par. 524.01[3] at 524-16 (1st ed. 1990) (citing S.Rep. No. 989, 95th Cong., 2d Sess. 80-81, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5866-67); see also In re Bracy, 449 F.Supp. 70, 71 (D.Mont.1978) (“it is the policy of the law to discharge the bankrupt but not to release from liability those who are liable with him”). “What is important to keep in mind is that a discharge in bankruptcy does not extinguish the debt itself but merely releases the debtor from personal liability.... The debt still exists, however, and can be collected from any other entity that may be liable.” In re Lembke, 93 B.R. 701, 702 (Bankr.D.N.D.1988). The courts have reconfirmed this basic principle in case after case permitting creditors whose claims have been discharged vis-a-vis the bankrupt to recover *601 on the same claims from third parties in a variety of settings.[6]
At oral argument, counsel for appellees maintained that confirmation of LDP’s reorganization plan would somehow bind Abel to refrain from pursuing his independent statutory lien claim against PSO. The Code and ease law plainly belie this position. Under 11 U.S.C. § 1141(a), “the provisions of a confirmed plan bind the debtor ... and any creditor,” but, consistent with the above discussion of sections 524(a) and 524(e), “the confirmation of a plan ... discharges the debtor [not anyone else] from any debt that arose before the date of such confirmation [such as that owed Abel under section 365(g) ].” 11 U.S.C. § 1141(d)(1)(A) (emphasis added). See United States v. Stribling Flying Serv., Inc., 734 F.2d 221, 223 (5th Cir.1984). Neither the confirmation of a plan nor the creditor’s recovery (of partial satisfaction) thereunder bars litigation against third parties for the remainder of the discharged debt. Id. at 223; Union Carbide Corp. v. Newboles, 686 F.2d 593, 595 (7th Cir.1982); see, e.g., In re Jet Florida Sys., Inc., 883 F.2d at 972-73; In re Sandy Ridge Dev. Corp., 881 F.2d at 1350-51; Beconta, Inc. v. Schneider, 41 B.R. 878, 879-80 (E.D. Mich.1984).[7] The same holds true specifically where, as here, the creditor’s bankruptcy claim is based on an executory contract that is both rejected under section 365(a) and subject to limitation in amount by the bankruptcy court pursuant to section 502(b). See In re Modern Textile, Inc., 900 F.2d 1184, 1191-92 (8th Cir.1990) (trustee’s rejection of sublease under section 365(a) did not extinguish debtor’s unpaid obligation thereon, and cap imposed by section 502(b)(6) on sublessor’s resulting breach of contract claim against debtor did not cut off sublessor’s right to recover balance of the obligation from debtor’s guarantor).
All of the principles discussed above are pertinent to the availability of special injunctive relief pursuant to section 105(a), since.a bankruptcy court’s supplementary equitable powers thereunder may not be exercised in a manner that is inconsistent with the other, more specific provisions of the Code. See Official Committee of Equity Sec. Holders v. Mabey, 832 F.2d 299, 302 (4th Cir.1987), cert. denied, 485 U.S. 962, 108 S.Ct. 1228, 99 L.Ed.2d 428 (1988); In re Golden Plan of Cal., Inc., 829 F.2d 705, 713 (9th Cir.1986); Johnson v. First Nat’l Bank, 719 F.2d 270, 273 (8th Cir.1983), cert. denied, 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). See generally Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206, 108 S.Ct. 963, 968-69, 99 L.Ed.2d 169 (1988) (“whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code”). Accordingly, we follow the Ninth Circuit’s lead in In re American Hardwoods, Inc., 885 F.2d at 621 and hold that while a temporary stay prohibiting a creditor’s suit against a nondebtor (in American Hardwoods, the bankrupt’s guarantor) during the bankruptcy proceeding may be permissible to facilitate the reorganization process in accord with the broad approach to nondebtor stays under section 105(a) outlined above, the stay may not be extended *602 post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor. See id. at 625; see also In re Rohnert Park Auto Parts, Inc., 113 B.R. 610, 615-17 (9th Cir. BAP 1990) (following American Hardwoods). Not only does such a permanent injunction improperly insulate nondebtors in violation of section 524(e), it does so without any countervailing justification of debtor protection — as discussed earlier, the discharge injunction provided for in section 524(a) already frees the debtor from potential derivative claims, such as indemnification or subrogation, that might arise from the creditor’s post-confirmation attempts to recover the discharged debt from others.
To sum up, the bankruptcy court’s determination of Abel’s contract claim for pre-petition fees is REVERSED and the cause is REMANDED for reconsideration in light of the principles set out herein. The injunction issued against Abel is AFFIRMED only insofar as it temporarily precludes, during the pendency of this bankruptcy proceeding, the pursuit of fees that are subject to indemnification by LDP; in all other respects the injunction is VACATED.

. In Cutler, the plaintiff's allegations suggested that the mere commencement of foreclosure actions, accomplished by counsel before his discharge, was the operative condition triggering counsel’s contingency fee, 51 P.2d at 709, which the court ordered paid. However, the evidence actually recounted by the court showed that counsel was retained "to render certain services ... including the foreclosure of mortgages [a matter not accomplished simply by commencing suit], and that his compensation for these services should be a sum equal to one-half of the attorney’s fee provided for by the notes and mortgages upon which he filed suits for foreclosure,” id. at 710. The “filed suits” language seized upon by appellees here evidently and quite reasonably was employed to identify which foreclosure actions counsel would be paid on, not to specify the (peculiarly premature) moment his contingency fees became due and owing. In any event, the distinction drawn by appellees was of no apparent concern to the court, which is the primary point made above.

. Section 502(b)(4) provides for the allowance of a claim over objection "except to the extent that ... if such claim is for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services.”

. A vivid illustration of this point may be found in Venegas v. Skaggs, 867 F.2d 527 (9th Cir.1989), aff'd, — U.S. -, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990). In that case, a $406,000 contingency fee was enforced in favor of plaintiffs counsel even though the corresponding fee recovered by plaintiff from defendants under 42 U.S.C. § 1988 was only $75,000. Significantly, the Ninth Circuit and the Supreme Court both flatly rejected plaintiffs argument that, because of its gross (fivefold) discrepancy from the lode *598 star-based fee deemed reasonable with respect to the same services under section 1988, the contingency fee was excessive. Instead, consistent with what we have said above, the courts held the much higher contingency fee reasonable because it reflected the risk of nonrecovery assumed by plaintiff’s counsel (and likewise assumed, albeit only to a partial extent, by Abel here). See id. at 528-29, 534, aff’d, 110 S.Ct. at 1684.

. We say "may well,” because we do not foreclose the possibility that the bankruptcy court properly could deprive Abel of the same benefit under section 502(b)(4) through adherence to the prescribed statutory procedure.

. See, e.g., In re Harris, 85 B.R. 858, 863 n. 7 and accompanying text (Bankr.D.Colo.1988); In re Constantino, 80 B.R. 865, 866-70 (Bankr.N.D. Ohio 1987); In re Rentas, 80 B.R. 25, 26 (Bankr.S.D.N.Y.1987) (though violation of section 524(a) deemed nonwillful for purposes of contempt sanctions); In re Santos, 24 B.R. 688, 689-91 (Bankr.D.R.I.1982). See generally L.F. Rothschild & Co. v. Angier, 84 B.R. 274, 276-77 (D.Mass.1988) (citing numerous cases for application of discharge injunction (section 524(a)) and automatic stay (section 362(a)) to various claims for indemnification and contribution arising out of debtors' pre-petition conduct).

. See, e.g., United States v. Anderson, 366 F.2d 569, 571 (10th Cir.1966) (suit against debtor’s guarantor); In re Jet Florida Sys., Inc., 883 F.2d 970, 973 (11th Cir.1989) (suit against debtor’s insurance carrier); In re Sandy Ridge Dev. Corp., 881 F.2d 1346, 1351 (5th Cir.1989) (suit against debtor’s guarantor); In re Pappas, 106 B.R. 268, 270-71 (D.Wyo.1989) (suit against debtor’s insurance carrier); United States v. Quinones, 36 B.R. 77, 79 (D.P.R.1983) (suit against comaker of note); United States v. Hass, 152 F.Supp. 715, 716 (E.D.N.Y.1957) (same); In re Fasse, 40 B.R. 198, 199-200 (Bankr.D.Colo.1984) (suit against state "Recovery Fund” established for satisfaction of judgments recovered 122 B.R. — 27 against bankrupt real estate brokers and salesmen).

. Indeed, in keeping with the narrow breadth of section 524(a) and the mandate of section § 524(e), the fact that the debtor may be involved in the ensuing litigation, even named as a defendant where necessary to enable recovery against a codefendant (such as a liability insurer), does not permit invocation of section 524(a) to preclude a creditor’s post-bankruptcy pursuit of a discharged claim against a third party. See, e.g., In re Jet Florida Sys., Inc., 883 F.2d at 973; In re Pappas, 106 B.R. at 270-71; In re Fasse, 40 B.R. at 200.