768 A.2d 62

**BROWN & STURM, et al.**

v.

**FREDERICK ROAD LIMITED PARTNERSHIP, et al.**

No. 85, Sept. Term, 2000.

Court of Special Appeals of Maryland.

March 5, 2001.

152

154

Charles E. Iliff, Jr. (Stephan Y. Brennan, Iliff & Meredith, P.C., Baltimore, and Philip J. McNutt and Hughes & Bentzen, PLLC, Rockville, on the brief), for appellants.

Albert D. Brault (Brault, Graham, Scott & Brault, LLC on the brief), Rockville, for appellees.

Argued before SALMON, KENNEY and RAYMOND G. THIEME, Jr. (Ret'd, Specially Assigned), JJ.

RAYMOND G. THIEME, Jr., Judge, Ret'd, Specially Assigned.

This is an appeal from the judgment of the Circuit Court for Montgomery County rejecting the efforts of appellants to recover legal fees in the amount of $4,810,919.75 pursuant to a reverse contingency fee agreement for representation before the United States Tax Court during 1987 and 1988. Appellants, attorneys R. Edwin Brown and Rex L. Sturm, and their respective law firm of Brown & Sturm, represented and provided legal advice to the children of Lawson and Cordelia King ("the senior Kings"), who bought the 438–acre farm of their parents and subsequently incurred massive tax deficiencies after their parents died. Brown & Sturm had represented both the senior Kings in implementing that sale. Appellants filed this action against their daughter Elizabeth J. Jacobs,[1] her sister Lois K. Aschenbach, and Frederick Road Limited Partnership ("Frederick Road"), a partnership involving Aschenbach (collectively, "appellees").

The case *sub judice* is related to a separate legal malpractice action filed against Brown & Sturm by Aschenbach and Frederick Road. That action is now pending in the Circuit

---

1. Appellants and Jacobs have dismissed their respective appeals against each other, and she is not a party to this appeal.

Court for Montgomery County, following a decision by the Court of Appeals in *Frederick Road Ltd. P'ship v. Brown & Sturm,* 360 Md. 76, 756 A.2d 963 (2000) (reversing summary judgment in favor of Brown & Sturm). This case is also related to Brown & Sturm's claim in United States Bankruptcy Court for the District of Maryland to recover its fee from Jacobs' and Aschenbach's brother, William I. King, and Field Farms Limited Partnership ("Field Farms"), of which Jacobs was a member. The Bankruptcy Court rejected Brown & Sturm's claim, and the United States District Court and United States Court of Appeals for the Fourth Circuit affirmed.

In the instant case, the court below rejected appellees' motion for summary judgment and held a nine-day bench trial between January 12 and February 20, 1999. Following trial, the court issued a lengthy memorandum opinion and order favoring appellees on one of their three original theories,[2] that a confidential relationship existed between the parties at the time of the retainer agreement and Brown & Sturm failed to meet its burden of proving such fee agreement was voluntary and reasonable. Appellants now ask:

1. Did the court below err when it found that the retainer agreement between the parties was not voluntary?

---

[2] Appellees sought on three separate grounds to show they did not owe appellants any money. First, they contended that appellants had committed malpractice both in the transfer of the farm and in the tax litigation, and that appellants' negligence resulted in damages greater than their fee claim. Second, they sought to show that the fee claimed by appellants was unreasonable and excessive in violation of the Maryland Lawyers' Rules of Professional Conduct, and therefore, the trial court should rule in their favor on the basis of equitable defenses recognized in *Post v. Bregman,* 349 Md. 142, 707 A.2d 806 (1998), and *Son v. Margolius, Mallios, Davis, Rider & Tomar,* 349 Md. 441, 709 A.2d 112 (1998). Third, appellees argued that because there existed a confidential relationship between the parties at the time of execution, appellants failed to meet their burden of proving that the fee agreement was voluntary and reasonable. Appellees prevailed on the third ground; the court below declined to address the merits of the other two grounds.

2. Did the court below err when it found that the retainer agreement between the parties was not reasonable?

On cross-appeal, appellees ask:

1. Did the court below err when it found that collateral estoppel did not apply to this action?
2. Did the court below err when it declined to rule that the fee was unethical and unreasonable as a matter of law?

To these questions we answer "no" and explain.

## Facts

The trial court issued the following findings of fact, which we paraphrase.

Appellant R. Edwin Brown is an attorney licensed to practice in Maryland. At the time of the trial below, he had been engaged in private practice for fifty-seven years, specializing in condemnation and other land valuation cases. Brown has handled 500 such cases during his career and has tried many of them before juries. Throughout his career, he has worked with appraisers in the process of determining land values. Appellant Rex L. Sturm is an attorney licensed to practice in Maryland, Nebraska, and the District of Columbia. At the time of the trial, he had been engaged in the private practice of law for thirty years, twenty-nine of which had been as Brown's partner in Brown & Sturm.

Defendants at trial were Elizabeth J. Jacobs, Lois K. Aschenbach, and William I. King, all of whom are the children of the late W. Lawson and Cordelia E. King (collectively, "the King children" or "the King siblings"). Jacobs is also a general partner in defendant Field Farms, although neither Jacobs nor Field Farms is a party to this appeal. Aschenbach is a general partner in appellee Frederick Road. Appellants also named as defendants the Frederick Road General Partnership, its partners, and the trustees of the Aschenbach Children's Trust. As the trial court noted, however, no evidence was produced at trial regarding the liability of these defendants, and defendant Conrad V. Aschenbach, as personal representative of the Estate of Robert V. Aschenbach, pre-

vailed on summary judgment by showing that the claim against decedent had not been filed timely.

### A

### Sale of the King Farm

In 1981 Lawson and Cordelia King owned a 438–acre farm in Montgomery County. During that year, August C. Bonsall, long-time certified public accountant to both William King and Lawson King, recommended that the elder King sell the farm to his children or to a partnership created by the children. The purpose of the sale was to keep the property in the family and to reduce the enormous estate taxes that the children would pay if they inherited the farm from their parents. After changing his mind a few times, Lawson King finally decided to sell to the children.

In late September 1981, Bonsall contacted Stanard Klinefelter, Esq., of the firm of Piper & Marbury and advised him of the proposed sale. Bonsall told Klinefelter that the land had been appraised "for farm use only" at \$550,000,[3] and such price could be used as the sale price in this transaction, provided that a three-year agricultural easement was placed on the property. Klinefelter informed Bonsall that his plan was badly flawed, for any tax liability would be based not on the parcel's agricultural value, but instead on the fair market value for its highest and best use.[4]

---

**3.** According to appellants, Brown obtained this appraisal and two other "agricultural value" appraisals.

**4.** To the extent that taxpayers transfer property for less than the value of its highest and best use, the Internal Revenue Service will infer that a gift has been made and thus impose a gift tax upon the transfer. *See* 26 U.S.C. § 2512(b) (2000) ("Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year."); 26 U.S.C. § 2501(a)(1) (2000) ("A tax ... is hereby imposed for each calendar year on the transfer of property by gift during such calendar year by any individual, resident or nonresident.").

Accordingly, Bonsall authorized Klinefelter to investigate other alternatives, and he did. He approached G. Van Velsor Wolf, Esquire, a senior partner in Piper & Marbury's Estates and Trusts Department, and they began researching other options. The senior Kings had a long association with Wolf, having depended upon his advice and representation in tax and estate planning matters for several years. After Wolf and his colleagues developed several alternatives, two meetings took place—one in November 1981, with Wolf, Bonsall and Lawson King, and the other on January 2, 1982, with Wolf, Bonsall and Klinefelter.[5] King approved one of the proposals during the November meeting,[6] but by January, he wavered in his intentions again, and Bonsall reported to the lawyers that he was reluctant to sell the farm. Klinefelter heard nothing further from Bonsall after the January meeting.

Unbeknownst to the Piper & Marbury attorneys, King—egged on by Bonsall—proceeded to sell the farm to his children pursuant to the "badly flawed" estate plan. Brown and his firm Brown & Sturm were retained to handle the settlement. Brown had known Lawson King since high school and had represented him during the 1970's in a condemnation case.

Bonsall directed Brown to determine the sale price for the farm. Bonsall sent a contract of sale to Brown for review, covering 418 of the 438 acres of the parcel. (The senior Kings retained the family home and surrounding acreage.) Based on the parcel's agricultural value and using appraisals of three different evaluators, Brown determined that the King children should pay nearly $600,000 for the farm. After Brown reviewed the contract, the senior Kings and King children signed it on February 3, 1982. As Bonsall recommended, William King and Elizabeth Jacobs formed Field Farms and Lois Aschenbach formed Frederick Road to take title to the

---

**5.** Appellants testified that they were not aware at the time that these meetings were being held.

**6.** According to appellees, King approved a charitable trust to be drawn up by lawyers at Piper & Marbury.

farm. As part of the settlement, Sturm prepared assignments of the contract from the King siblings to their respective partnerships. The settlement took place on March 5.

When Klinefelter did not hear back from Bonsall by late February or early March 1982 regarding King's estate plan, he called the accountant. Klinefelter then learned, for the first time, that a contract of sale had been executed and settlement was either imminent or had just taken place. Klinefelter and Wolf then sought to convince Lawson King and his children to reverse the transaction or "correct" the sale. Wolf met separately with Lawson King, the children, and Brown, then memorialized these meetings in three letters, all dated May 17, 1982. In his meetings with the members of the King family, Wolf emphasized that the IRS would not accept the agricultural value appraisals, and that it would require a new valuation of the farm reflecting fair market value based upon the highest and best use for the land.

In his meeting with Brown, Wolf learned that Brown had been thus far unable to record the deed from the senior Kings to the children's partnerships, because Montgomery County taxing authorities believed that the sale price, upon which the County transfer tax would be imposed, was far below the fair market value of the farm. An assistant county attorney had advised Brown that the State Department of Assessments and Taxation ("SDAT") appraised the farm, without improvements, as of March 16, 1982, at $9,746,100. Brown also had been advised that the County might "request a professional real estate appraiser to make an appraisal of the property." Thus, at his meeting with Wolf, Brown agreed that he would "continue to pursue the new lead for obtaining a valid and viable 'fair market value' " and that no further effort to record the deed would be made while he was negotiating with the County over that value.

In his letter of May 17 to Brown, moreover, Wolf pointed out that the appraisals used to determine the sale price of the farm made a "clear distinction" between the agricultural use valuation and the fair market value. He opined that "[i]n our

case 'agricultural use' would certainly not appear to represent the 'highest and best use' as contemplated by the current federal tax law." Wolf concluded his letter with the following warning:

> But, as you know, the federal gift and estate taxes . . . insist not only upon "fair market value" at the very highest and best use, but also require full disclosure with regard to any transfer either by gift or death, with very substantial monetary penalties for not making full disclosure, including the possibility of fraud penalties and possibly even criminal prosecution in what the Internal Revenue Service might consider an extreme case.

Wolf's warning did not sit well with Lawson King, for soon thereafter, on June 23, 1982, he notified Piper & Marbury by letter that he hereby discharged Wolf and the firm as his attorneys.[7] Wolf wrote back, in a letter dated June 30, with the purpose of "alerting you to what well may be the perfectly calamitous financial situation *into* which you and Mrs. King may have fallen, due to the overwhelming tax liabilities to which you both may be subjected prior to your respective deaths." Wolf cautioned that Bonsall's plan "could not accomplish the tax benefits desired" and "could not possibly accomplish the goals that he and your other advisors had in mind."

Wolf copied the letter to Brown. William King also took a copy of the letter to Brown as well; however, Brown took no action. He told William King, in fact, that the letter simply expressed a difference of opinion regarding the transaction, Wolf was "out of place coming over and talking to Daddy [Lawson King]," and Brown & Sturm lawyers "were taking care of the deal." Brown did not advise William King or any other family member to consult with another attorney regarding the issues raised by Wolf's letter.

Likewise, Brown never followed through with promises he made at the May meeting with Wolf. At that time, Brown

---

7. Appellants assert that the dismissal of Piper & Marbury also related to a fee dispute.

understood that the purpose of selling the farm was to minimize taxes for all parties, and sale of the farm at its agricultural value would potentially raise serious estate or gift tax problems (or both) for the family. He also believed that Bonsall intended to file a gift tax return for the transaction. Brown, however, did not secure any new appraisals for the farm based upon fair market value at its highest and best use. Moreover, there exists no credible evidence that Brown ever advised Bonsall for use in the gift tax return of the appraisal figures, including SDAT's appraisal of nearly $9.75 million and an appraisal of $24.8 million prepared by John Gogerty and secured by the County during the transfer tax dispute.[8]

Despite all that had transpired, in December 1982, the family allowed Brown & Sturm to handle the settlement for transfer by sale of the family home and the remaining 20 acres from the senior Kings to the King children's partnerships for $248,100. That sale was based on the agricultural use valuations also used in the March 1982 transfer. Bonsall later changed his recommendation to the family regarding the gift tax return, and he never filed such a return on behalf of the senior Kings.[9]

---

**8.** Although Brown testified that he gave "comparables" to Bonsall, he never testified that he gave *appraisal values* to Bonsall. Indeed, he did not recall *ever* discussing with Bonsall a valuation figure to be put into the gift tax return. Brown also testified that the Gogerty appraisal amount was $27 million. In his letter to Thomas Cryan, Esquire, Assistant District Counsel for the Internal Revenue Service, however, Brown said that Gogerty appraised the farm at $1.24 per square foot, or $24.8 million.

**9.** Appellants explain that Bonsall set forth both "aggressive" and "conservative" approaches to handling the gift tax issue. The aggressive approach entailed filing an immediate return, which Bonsall expected that the IRS would contest. He opined that the IRS's initial view would be "an uninformed ... first impression of high value" that would be eventually reduced because it would not have taken into account "perils that could besiege the property" in the process of converting it from a working farm into property suitable for development or commercial use. The conservative approach, on the other hand, would be to "not file a gift tax return and face the issue upon IRS examination of the estate tax returns." In that case, "the passage of time would bring forth the reliability of the assumptions of risk" with regard to the

## B

### Tax Litigation—Phase I

Cordelia King died in 1983, and Lawson King followed her in death during 1985. In 1985 the IRS began investigating transfer of the farm in 1982 from the senior Kings to the children's partnerships. Not surprisingly, the federal taxation authorities claimed that substantial taxes were due because the children had purchased the farm at a price well below the fair market value for its development use. From 1985 to 1987, the IRS dealt exclusively with Bonsall, who had prepared the tax returns for the senior Kings' estates. After it failed to reach a settlement by negotiating with Bonsall, the IRS issued deficiency notices, dated July 1, 1987, and August 28, 1987. These notices assessed liability for gift and estate taxes, as well as penalties for fraud and undervaluation, at $68 million, excluding interest. The assessments were based upon the IRS's determination that the farm had a fair market value of $60 million.

On July 21, 1987, the King children retained Brown & Sturm "to represent us in all Tax Matters relative to the Estate of W. Lawson King and the Estate of Cordelia E. King pending before the Internal Revenue Service." There was no oral or written agreement at the time between Brown & Sturm and the King children regarding the fee for this representation.

In reference to the deficiency notices, Brown opined that the government's valuation was "entirely too high" to the point of being "confiscatory." Bonsall likewise declared that the government's valuation was "ridiculous." Brown believed that the deficiency claims could be defended on the basis of valuation and so advised the King children. James Jacobs, husband of defendant Elizabeth Jacobs, testified at trial that Brown had given the children "every indication . . . that there

---

development of the property. Ultimately, the senior Kings followed the latter advice, because they believed that conversion of the property entailed substantial risks.

should not be a real tax problem" and "that there would be, if any, a very minimis [*sic* ] tax."

Because Brown & Sturm had never before tried a case before the United States Tax Court[10]—indeed, Brown had never set foot in Tax Court—Brown secured permission from the family to retain Charles Burton, Esquire, an experienced tax litigator. The King children agreed to compensate Burton and other attorneys from his firm at the rate of $125 per hour. Brown also obtained permission to hire two appraisers, Ron Lipman and Bud Dieudonne, as consultants[11] and secure retroactive fair market appraisals of the farm from two other appraisers, Adolph Rohland and Oscar Beasley, Jr. Brown received Rohland's appraisal, which determined the fair market value of the farm to be $6.2 million, during October 1987. He forwarded this appraisal to William King, with a cover letter stating that the appraisal "appears to be well done." Brown did not receive Beasley's appraisal for $10.4 million until on or about February 29, 1988.

Neither Brown nor Sturm testified at trial regarding the specific legal services, other than those outlined *supra*, that they rendered for the King children between July 21, 1987, and January 20, 1988, while the fee agreement was under negotiation. The firm kept *no* time records or other documents summarizing its legal services in the tax litigation. According to *Burton's* billing statements, however, Brown & Sturm

i. held four personal and ten telephone conferences with Burton or a member of his firm regarding the tax litigation;

---

10. Sturm, however, had been admitted in United State Tax Court for several years.

11. Lipman and Dieudonne had prepared appraisals as part of two condemnation cases involving part of the farm property in the mid 1980's. Brown represented the King family in these cases. Brown's purpose in hiring these two consultants was to prevent the IRS from using them or their appraisals at trial in the tax litigation.

ii. prepared nine petitions for filing in United States Tax Court in response to nine IRS deficiency notices;

iii. reviewed correspondence regarding Burton's revisions to those petitions; and

iv. reviewed the answers of the IRS to the petitions and decided to file replies to the same.

On January 20, 1988, appellants executed a fee agreement with the King children.

## C

### The Fee Agreement

Brown & Sturm proposed an initial fee agreement to the King children in September 1987. This proposal was not limited to the tax litigation; instead, Brown & Sturm wanted the King children to retain them "on a continuing basis" for "all legal matters in any way touching upon the aforesaid lands and premises." These legal matters were to include "development decisions, zoning problems, financing and refinancing problems, sales, lease negotiations, and many other related matters." For these services, Brown & Sturm wanted eight percent of all money received from sales, rents, royalties, and license fees generated by sales, leases or development of the farm, except agricultural rentals or debt financing for taxes or development front money. The proposed agreement was to remain in effect as long as any of the King children retained an interest in the farm. Essentially, Brown & Sturm sought to become an eight-percent partner in the King children's development ventures.

The King children, not surprisingly, rejected this sweeping proposal, stating that they did not "feel it is in our best interest on a long-term basis to make the commitments detailed in your proposal." They went on to request that Brown & Sturm develop a fee agreement that addressed the immediate concerns caused by the tax claims. At some point between September 1987 and mid-January 1988, moreover, the King children requested that Brown & Sturm take their case on an

hourly basis. The firm refused this request, stating that its services were not billed on an hourly basis,[12] but agreeing in principle to take a percentage of the tax savings achieved in litigation. Brown & Sturm thus submitted a second proposed fee agreement in which its fee would be ten percent of any savings achieved in the tax liability and fraud and undervaluation penalties, but not interest, measured from the amounts claimed by the IRS in the deficiency notices. When the King children complained that fraud was not a real issue in this case, Brown & Sturm reduced the fee percentage for any reduction in the fraud penalties to five percent. All parties executed the fee agreement on January 20, 1988.[13]

---

12. In Brown's own words, "[W]e said no, that we did not work by the hour. We weren't—we weren't for sale by the hour." Brown also testified regarding the firm's policy on hourly billing:

> Q: Now, when you were discussing with your clients the fact that you would not take an hourly fee, what was your plan if they insisted on an hourly fee? Would you have withdrawn from the case?
> A: I would have; yes.
> Q: So, that it is fair to say that they had to agree to a contingent fee or lose you as their lawyer?
> A: They had to—that's true. They'd have to get other counsel. I couldn't work that case on an hourly basis.

13. We note, at this point, that appellants explain that Burton gave his blessing to the fee agreement with the King children. They point out that Burton had told Brown & Sturm that he customarily represented clients in tax deficiency cases on a contingent fee basis, and his typical fee was 20 to 30 percent of any reduction in the taxes, penalties, and concomitant interest assessed by the IRS in the deficiency notices. Burton testified that Brown & Sturm's fee agreement was appropriate and reasonable because of the risks involved.

Appellees, on the other hand, point to the testimony of John Marshall, Esquire, who averred at trial that Brown & Sturm had acted unethically when it set forth a reverse contingency fee based on IRS valuation of the farm. The government's inflated valuation, Marshall explained, did not realistically estimate the King children's potential exposure. He further opined that Brown had acted unethically when he factored fraud penalties into the reverse contingency fee if he believed, as he claimed, that such penalties would not be imposed. Sheldon S. Cohen, Esquire, former Commissioner of the Internal Revenue Service, testified that in most cases tried before the Tax Court, attorneys bill at a standard hourly rate. Although an attorney might agree to use a reverse contingency arrangement in some circumstances, he would usually cap any fees payable under those arrangements.

## D

### Tax Litigation—Phase II

As the tax litigation progressed, Brown & Sturm continued to develop evidence on the fair market value of the farm. Beasley delivered his appraisal in late February 1988, estimating the farm's fair market value to be $10.4 million. Brown commissioned two additional retroactive fair market value appraisals, one from L.W. "Pat" Fey for $5.1 million, and the other from William Harps for $4.9 million. Both Brown and Sturm believed these appraisals were valid and would stand up under the Tax Court's scrutiny.

The IRS likewise developed evidence on the farm's fair market valid during the same time frame. One IRS expert, Anthony Reynolds, found the fair market value to be about $36.5 million. In a letter dated November 28, 1988, Brown opined that Reynolds' analysis had been seriously flawed. He also, however, indicated a willingness to negotiate a compromise regarding the farm's value, and shortly thereafter settlement negotiations ensued.[14]

Prior to the trial, the parties reached a settlement agreement, and the King children signed off on it. In the agree-

---

14. Appellees point out that Brown & Strum never considered employing what might have been its strongest defense against the fraud claim before the Tax Court: that the Kings had relied upon erroneous professional advice by Bonsall. Such a defense might have required appellants to testify before the Tax Court, which would have created a conflict in their representation under the Maryland Lawyers' Rules of Professional Conduct and forced them to withdraw. *See* Md. R. Prof. Conduct 3.7 (precluding a lawyer from acting as an advocate in a trial during which he is likely to be a witness).

We also note that Brown's advice to the King children to settle was a significant reversal from his previous position, that the fraud claim against them was baseless, the transaction was a bona fide sale, and the children would eventually prevail in Tax Court. Appellees claim that Brown took the earlier position despite his knowledge that the IRS possessed Wolf's letter of May 17, 1982, detailing the potentially catastrophic tax consequences of the proposed sale. To justify his turnabout, Brown told the children that the letter and associated testimony would compromise their defenses to the fraud claim and expose them to enormous penalties—penalties he had previously denounced as absurd.

ment, the King siblings allowed the tax value of the farm to be set at $20 million; in turn, the IRS waived all penalties, as well as fraud, undervaluation, and other potential claims. The siblings' total liability came to about $20 million.

On January 20, 1989, Brown & Sturm sent the King children a statement quantifying the fee due pursuant to the retainer agreement. The total fee for Brown & Sturm's representation, based upon the reduction in the tax value of the farm from $60 to $20 million and elimination of the penalties, came to $4,810,919.75. The King children did not dispute the accuracy of the fee computation. In contrast, we note that the King children paid $30,000 to Burton, the tax expert, for his significant legal services during the tax litigation.

To pay taxes and legal bills, the King children sought to sell the farm for development as quickly as possible. Unfortunately, the market for commercial development real estate was soft at the time, and without the sale of the farm, the children were unable to pay Brown & Sturm's fee. Thus, on March 2, 1989, the parties entered into an addendum whereby payment of the fee would be deferred until December 15, 1990, and the children would pay interest at the rate of ten percent per annum dating from March 15, 1989. Over the next several years, the King children paid Brown & Sturm interest amounting to $1,637,000, but no payments were applied against the principal. Appellants filed the instant claim, for breach of contract, in September 1996.

## E

### The Bankruptcy Litigation

Not surprisingly, the still-huge tax bill, sizable legal fees, and poor real estate market drove William King and his partnership, Field Farms, into Chapter 11 bankruptcy. In the United States Bankruptcy Court for the District of Maryland, appellants filed two proofs of claim, one for approximately $6 million for work performed in connection with the tax litigation and one for $1 million representing other legal services.

In June 1995, King and Field Farms filed adversary proceedings asserting various claims against Brown & Sturm for $50 million in damages. The Bankruptcy Court tried the case and found that the fee claim for the tax litigation exceeded the reasonable value of such services as analyzed under the Bankruptcy Code. *See* 11 U.S.C. § 502(b)(4) (2000). As such, the court disallowed the claim. The United States District Court and United States Court of Appeals for the Fourth Circuit affirmed that finding.

Additional facts will be supplied *infra* as needed.

### Discussion

▇▇▇▇ In the case *sub judice*, we review the trial court's findings on mixed questions of fact and law and questions of law. We review findings of fact in the trial court under the standard of review stated in Maryland Rule 8–131. In a bench trial like this one, "the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). The trial court is thus the gatekeeper for receiving and weighing the evidence. In contrast, we are bound by the trial court's evidentiary findings, and we will not disturb those findings on appeal if they have support in any competent material evidence, even if we would have reached a different conclusion regarding that evidence. *Barnes v. Children's Hosp.,* 109 Md.App. 543, 553, 675 A.2d 558 (1996); *Mayor & Council of Rockville v. Walker,* 100 Md.App. 240, 256, 640 A.2d 751 (1994). Likewise, for mixed questions of fact and law, such as the questions posed by appellants, we will affirm the trial court's judgment when we cannot say that its evidentiary findings were clearly erroneous, and we find no error in that court's application of the law. *Bowers v. Eastern Aluminum Corp.,* 240 Md. 625, 626–27, 214 A.2d 924 (1965). On questions of law alone, such as those raised by appellees on cross-appeal, where there is no dispute as to the facts, Rule 8–131(c) does not apply. *Pappas v. Modern Mfg. Co.,* 14 Md.

App. 529, 538, 287 A.2d 798 (1972). In the instant case, we hold on all questions that the court below did not err.

■■■■ The trial court's analysis of whether the retainer agreement was valid was properly rooted in a well-settled proposition of law: Prior to retention, an attorney may bargain at arm's length with a prospective client, but after that attorney has been hired, the parties stand in a confidential and fiduciary relationship, and the attorney bears the burden of showing that any subsequent transaction with his client is voluntary and fair. *Attorney Grievance Comm'n v. Korotki*, 318 Md. 646, 666, 569 A.2d 1224 (1990) (citing *Attorney Grievance Comm'n v. Wright*, 306 Md. 93, 106, 507 A.2d 618 (1986); *Tucker v. Dudley*, 223 Md. 467, 473, 164 A.2d 891 (1960); *Etzel v. Duncan*, 112 Md. 346, 350–51, 76 A. 493 (1910); *Merryman v. Euler*, 59 Md. 588, 591 (1883)). Indeed, in such circumstances, the law makes a presumption against the attorney and in favor of the client. *Merryman*, 59 Md. at 591; *see also Etzel*, 112 Md. at 351, 76 A. 493.

■■■ Here, the trial court found that a confidential relationship existed between the parties when the retainer agreement under dispute was executed on January 20, 1988. We agree, finding no clear error. Indeed, were we the trial court, we would be hard-pressed to conclude otherwise from the facts in evidence, given that over the six-month period prior to execution of the retainer agreement, Brown & Sturm provided various services related to the management of litigation, which included hiring consultants, appraisers and other counsel; securing a retroactive fair market appraisal for the farm; consulting extensively with co-counsel specializing in tax litigation; preparing pleadings for filing in the United States Tax Court; and reviewing IRS pleadings in the litigation. Regardless of the good motives claimed by appellants for performing legal services prior to the execution of a retainer agreement,[15] under Maryland law,[16] appellants bear "the *onus*

───────────

**15.** Appellants state that

... to prove the entire *bona fides* and fairness of the transaction." *Merryman*, 59 Md. at 591.

## I

## Voluntariness of Retainer Agreement

■ Given that a confidential relationship existed, Maryland's law governing voluntariness in transactions between attorneys and clients applies to the fee agreement. For a contract between attorney and client to be voluntary,

i. the attorney must not use his dominant position in the relationship to take unfair advantage of the client, and

ii. the attorney must provide full disclosure of all information and advice required of the attorney under the existing confidential relationship.

---

[a]ll ... actions were undertaken in the furtherance of the King siblings' interests, and were not done for Brown & Sturm's benefit.... The King siblings were in a more tenuous position *before* Brown & Sturm filed the petitions in Tax Court, and *before* the appraisers and Mr. Burton's firm were hired. The services provided by Brown & Sturm before the terms of their compensation had been negotiated and finalized *placed the clients in a more advantageous position* than they would have been in if Brown & Sturm had insisted on negotiating and finalizing the terms of a fee agreement before Brown & Sturm would do anything for them.

Appellants also claim that it undertook these actions without security for any fee at a time when the King siblings could have hired other attorneys, such as Burton, or Stephen Winter, Esquire, who had represented Lois Aschenbach in related matters, to run the tax case and benefit from Brown & Sturm's early work. This view ignores the King siblings' potential liability to Brown & Sturm in *quantum meruit* had they hired other counsel.

16. Appellants make much of California authority, *Campagna v. City of Sanger*, 42 Cal.App.4th 533, 49 Cal.Rptr.2d 676, 681 (1996), stating that "[a] conflict of interest ... does not necessarily arise simply because there is a preexisting attorney-client relationship or the attorney represents the client on a related matter." A large body of Maryland law exists governing creation of an attorney-client relationship, and even if it did not, it is clear that here Brown & Sturm represented the King children not simply in "a related matter," but in the early phases of the matter at hand. Appellants had, in fact, represented the senior Kings in related matters and, even if no formal attorney-client relationship existed, appellants had worked closely with the King siblings on related matters as well. *Campagna* is thus inapposite.

*Korotki,* 318 Md. at 666, 569 A.2d 1224 (" '[T]he attorney has the burden of showing, not only that he used no undue influence, but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been had the client dealt with a stranger.' ") (quoting *Etzel v. Duncan,* 112 Md. at 350–51, 76 A. 493).

## A
### Appellants' Misuse of Their Dominant Position

The evidence supports the finding that Brown & Sturm exercised dominance over the King children. The undisputed evidence shows that, although the firm's lawyers lacked experience in handling appeals before the United States Tax Court, they clearly offered their clients in this case extensive expertise in the determination of land values. Indeed, condemnation and land valuation cases have been the cornerstone of Brown's law practice for nearly fifty years. Brown himself, in fact, testified that the King children needed counsel with vast experience in land valuation during the tax litigation, and he explained that he had handled hundreds of such cases over the past forty-five years. Brown & Sturm also had unique knowledge of the farm, having served as the settlement attorneys in 1982 and having performed various legal services for King family members between 1981 and 1994. The court thus found that Brown & Sturm, by virtue of its acknowledged expertise in matters of land valuation, exercised dominance vis-a-vis the King children in a tax litigation matter hinging upon valuation of the King Farm.

■ Because Brown & Sturm's lawyers were in a position of dominance over the King children, they had a duty to refrain from taking unfair advantage of the children's dilemma. The trial court's findings of fact show that Brown & Sturm failed to exercise proper restraint. First, the court found as a fact that in their initial fee proposal to represent appellees, the appellants sought "to take unfair advantage of

the [appellees] by overreaching." The court's findings of fact are supported by at least four undisputed facts:

i. Appellants did not comply with appellees' requested scope of representation by limiting their proposed representation to those matters pending before the Internal Revenue Service.

ii. The agreement gave appellees no recourse to dismiss appellants should they prove to lack needed expertise or perform substandard legal work.

iii. The proposed compensation, which would have been based upon sales, leases or development of the farm, bore little relation to the actual work being done, and appellants could conceivably have received substantial sums of money for rendering few or no legal services.

iv. The agreement required appellees to continue compensating appellants even if they eventually discharged them. Payment was contingent upon the King children's continuing ownership or control of the farm, rather than the duration of representation.[17]

Next, when the court found that when King siblings resisted appellants' fairly patent efforts to become co-developers for the land and sought an hourly billing arrangement, they clung inappropriately to another non-standard fee arrangement, a reverse contingency fee agreement. Brown himself averred that the firm would have withdrawn from representation had

---

**17.** Appellants make much of the court's findings regarding the initial fee agreement that appellees rejected. They point to opinions of the Committee on Ethics of the Maryland State Bar Association, Ethics Docket Nos. 86–84 and 92–21, and the Restatement (Third) of the Law Governing Lawyers § 46 (Proposed Final Draft No. 1, 1996), stating that fees based upon a percentage of the value of property or revenues from property are neither unheard of nor *per se* unethical. We question, however, whether the Committee on Ethics and the Restatement commentators would endorse a fee arrangement like the one proposed, designed to endure for as long as the client owned the parcel in controversy. Moreover, the court's comments were not intended to set forth a hard-and-fast rule banning fee arrangements based on rents and profits. We believe, instead, the court sought to reveal appellants' motive in forcing an oppressive fee agreement upon their clients—to elbow their way into a potentially lucrative business opportunity.

appellees insisted upon hourly billing. Moreover, the court heard expert testimony from a former Commissioner of the Internal Revenue Service, now a successful private practitioner, stating that reverse contingency arrangements are permissible, but that the client's wishes govern when he asks that time and expenses form the basis for a billing agreement, as had the King children.[18] The court also acknowledged appellees' "sense of desperation" in seeking legal services from Brown & Sturm, quoting their letter dated September 11, 1987, rejecting the initial fee proposal: *"We urgently need your legal services* .... We trust you will accept our request for services ... in accordance with *our immediate needs. A prompt response* will be appreciated." By conditioning continued services upon a reverse contingency arrangement, the court found, appellants coerced appellees, "depriv[ing them] of the ability to choose a fee agreement that was in their best interests."

We see no clear error in the court's findings of fact, and we also conclude that the court applied the law properly to those facts. Not only does the court's opinion rely upon competent material evidence, but the weight of the evidence presented by *both* sides undergirds a finding for appellees. Without question, Brown & Sturm continuously represented members of

---

**18.** Appellants assert that the court erred when it accepted the testimony of Commissioner Cohen, because the Maryland Court of Appeals has allowed the use of reverse contingent fees in taxation cases. *See, e.g., Gladding v. Langrall, Muir & Noppinger,* 285 Md. 210, 401 A.2d 662 (1979); *Kirsner v. Fleischmann,* 261 Md. 164, 274 A.2d 339 (1971). They ignore, however, the trial court's well-defined role as finder of fact, and they misunderstand the nature of Cohen's testimony. Cohen did not assert that reverse contingent fees are illegal; instead, he testified as to common and accepted practices among attorneys who represent clients before the IRS. Beyond the court's clear authority to weigh the testimony of all witnesses, including experts, the court acknowledged that Cohen had simply given standard of practice testimony necessary for its consideration of whether appellants' fee was reasonable under the Maryland Lawyers' Rules of Professional Conduct Rule 1.5. That rule enumerates eight factors to be considered in determining reasonableness. *See* Md. R. Prof. Conduct 1.5(a)(3) ("The factors to be considered in determining the reasonableness of a fee include ... the fee customarily charged in the locality for similar legal services.").

the King family for several years on matters related to the sale of the farm. Despite its breathtaking failure to safeguard the King children's best interests by heeding warnings about the tax consequences of the sale, Brown & Sturm brought considerable land valuation experience to the table that obviously bolstered the King family's confidence in and dependence upon the firm. After the initial flurry of criticism regarding Bonsall's ill-advised plan to sell the farm, the King siblings had no reason to believe that Brown & Sturm's valuation of the farm and analysis of the Tax Court's claim were based upon any factors other than genuine diligence and concern. The court below did not err in finding that appellants misused their dominant position.

## B

### Appellants' Failure to Make Full Disclosure

In negotiating the fee agreement, appellants not only took advantage of their dominant position vis-a-vis the King children, but they also failed to make full disclosure of all information and advice that the siblings would have required under the existing confidential relationship. In Maryland, whether an agreement between attorney and client is voluntary depends upon such disclosure. *See Korotki,* 318 Md. at 666, 569 A.2d 1224. "Consequently, if the attorney relies on a special fee arrangement in defense of a . . . complaint that a clearly excessive fee has been charged, the attorney must demonstrate that the arrangement was made 'after disclosures appropriate to the existing confidential relationship. . . .' " *Id.* (quoting *Wright,* 306 Md. at 106, 507 A.2d 618). The undisputed evidence here shows that the reverse contingency fee was based on a reduction in the tax liability claimed by the IRS, which in turn, was premised upon the farm having a fair market value of $60 million, an inflated sum of more than double any other contemporaneous appraisal of the property. The court below found, based on the evidence presented at the trial, that Brown & Sturm failed to disclose to the family at the time of the agreement a more realistic worst-case market

value of the farm for the purposes of federal taxation—and that information would have significantly reduced the amount agreed upon as a benchmark for tax liability in the retainer agreement.

The trial court based its finding upon competent, material evidence, much of which was undisputed. Evidence adduced at the trial demonstrated that Brown & Sturm knew of other appraisals of the farm that had been performed during fee negotiations. These appraisals were significantly shy of the $60 million appraisal upon which the IRS deficiency notice had been based.

The court also applied the law correctly. It first cited Rule 1.5(c) of the Maryland Lawyers' Rules of Professional Conduct,[19] which governs contingency fee arrangements in this State. Because Rule 1.5(c) is silent regarding reverse contingency fees, the court also relied upon the equivalent American Bar Association (ABA) Model Rules of Professional Conduct Rule 1.5(c)[20] and Formal Opinion 93–373 of the ABA Committee of Ethics and Professional Responsibility, which, we note, is the leading opinion on this issue. Formal Opinion 93–373 states "that in a reverse contingent fee agreement, there must be a reasonable benchmark figure from which the savings are to be calculated." The court thus concluded, on the basis of expert testimony regarding the standard practices in the

---

**19.** Rule 1.5(c) states:

A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee agreement is prohibited by paragraph (d) or other law. The terms of a contingent fee agreement shall be communicated to the client in writing. The communication shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.

**20.** Model Rule 1.5(c) is substantially identical to Maryland Rule 1.5(c).

setting of reverse contingency fees, that the benchmark in the case *sub judice* was unreasonably high.

Formal Opinion 93–373 explains that the amount demanded by the plaintiff cannot automatically be selected as a benchmark figure, for the plaintiff's original claim may be unrealistic:

> A plaintiff may sue defendant for $1,000,000, but the fact that sum is named in the complaint does not necessarily mean that plaintiff's claim can fairly be said to be for that amount. Plaintiff's counsel often overstate the amount to which their client is entitled, and indeed have little incentive for restraint. Thus, the amount demanded cannot automatically be the number from which the savings resulting from a judgment or settlement can reasonably be calculated.... Whether or not a specific ad damnum figure is mentioned, for an unliquidated claim, it is incumbent on the defendant's lawyer fairly to evaluate the plaintiff's claim and set a reasonable number as the amount from which the plaintiff's recovery will be subtracted to determine defendant's savings. *The sensitivity of this exercise becomes apparent when it is recognized that to the extent defendant's lawyer exaggerates the value of plaintiff's claim, defendant's lawyer enhances his or her prospect of recovering on the contingent arrangement.*

ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 93–373 at 1001:181–82 (1993) (emphasis added). The Committee goes on to suggest that though no *per se* rule applies and each case must be judged on its own facts, "the reasonableness of the amount of a 'reverse' contingent fee does depend on the degree to which savings from liability is reasonably ascertainable rather than a purely speculative one, which in turn may well depend on the character of the damages claim on which it is based." *Id.* at 1001:182.

Expert witnesses for the appellees agreed that the government's claim was unrealistic, and Brown & Sturm should not have presented it to clients as a basis for the fee. The court heard from John Marshall, Esquire, a prominent Atlanta

attorney and frequent lecturer on ethics. Marshall told the court that a lawyer who wanted to charge a reverse contingency fee "is required at the outset of the case, at the time the fee arrangement is agreed to by the client, to make a reasonable estimate of what the real exposure may be." The attorney, said Marshall, can "only . . . earn money on a reverse contingency fee if the disposition of the case was less than that reasonable exposure." When Commissioner Cohen testified, he agreed that the government's original estimate did not reflect the King siblings' actual exposure: "[T]here are deficiency notices and there are deficiency notices. There are some that are tight and ask for . . . the maximum the Government realistically views it can get, and there are others where you know there's water in them from the beginning." Appellants, as land valuation specialists, knew that the government's estimate in the deficiency notice was unrealistic—indeed, they had estimates in hand pertaining to State and County tax matters—and even if they lacked such knowledge, they had a duty, as appellees' attorneys, to research the matter carefully before holding out $60 million as a benchmark figure. Appellants thus failed to make the full disclosure to their clients that is required in a confidential relationship.

Appellants attack the court's use of the model rules and ABA ethics opinions interpreting them.[21] Maryland has, however, substantially adopted the ABA Model Rules into the Maryland Rules of Professional Conduct, including Rule 1.5, and the ABA's opinions regarding the Model Rules, though not binding, *Attorney Grievance Comm'n v. Gregory*, 311 Md. 522, 531, 536 A.2d 646 (1988), are highly persuasive authority in Maryland courts. *Id.* at 531–32, 536 A.2d 646 ("As a practical matter, . . . where an attorney can demonstrate reasonable reliance upon an ethics opinion on point, that fact is likely to have a significant effect on the initial decision of

---

**21.** Appellants also tell us that ethics opinions and case law regarding contingency fees, like legislation in reference to the same, do not apply retroactively to fees negotiated before the opinions were issued. They cite *no* authority supporting this "rule."

the Attorney Grievance Commission concerning the filing of a complaint, as well as upon the determination or disposition of those charges that may be filed."); *see, e.g., Attorney Grievance Comm'n v. Kemp,* 335 Md. 1, 17, 641 A.2d 510 (1994) (regarding Rule 1.1); *Prahinski v. Prahinski,* 321 Md. 227, 240, 582 A.2d 784 (1990) (regarding the inalienability of a lawyer's goodwill); *Attorney Grievance Comm'n v. Martin,* 308 Md. 272, 283, 518 A.2d 1050 (1987) (regarding a lawyer's involvement in a second profession).

Appellants also argue that the court's conclusion that the fee here was coercive in nature betrayed an "impermissible bias against contingent fees." We do not see such bias here at all-the trial court neither said nor implied that contingency fees were impermissible. Appellants instead fell under the weight of their own overreaching conduct and the competent, material, and often undisputed evidence regarding the same. In its opinion, the court stressed that, months into the representation, Brown & Sturm lawyers by their own admission threatened to withdraw as counsel unless the King siblings agreed to the reverse contingency arrangement. It is beyond dispute that had such a resignation occurred while the King siblings were in the midst of negotiations with the Tax Court, their chances of reaching a favorable outcome would have been prejudiced. As the trial court noted in its findings, moreover, the undisputed facts show that appellees at this time faced the loss of the family farm and even bankruptcy[22] and expressed to Brown & Sturm their clear sense of desperation about the dilemma. The undisputed facts also show that when the parties finally signed the agreement, over four months into the representation, the King children believed that no attorneys were better suited to defend their interests, and they believed they had no other choice but to go along with the fee agreement. Appellants thus used their dominant position to take undue advantage of appellees, and they failed to disclose fully to appellees information they had regarding the fair market value of the farm and their realistic tax

---

22. For William King, unfortunately, this fear became reality.

liability. For these reasons, we affirm the finding of the trial court.

## II

### Fairness of Retainer Agreement

 We also affirm the trial court's finding on appellants' second issue, whether the retainer agreement was fair. Under Maryland law, "the fact that the client agreed to the [amount of the fee] does not relieve the attorney from the burden of showing that the amount agreed upon was fair and reasonable." *Korotki*, 318 Md. at 666, 569 A.2d 1224 (quoting *Tucker*, 223 Md. at 473, 164 A.2d 891). Instead, courts determine whether a contingent fee is reasonable using two indicia of fairness, both of which must apply. First, the agreement must have been reasonable in principle when the parties entered into it. Second, after the contingency has been met and the fee quantified, the agreement must be reasonable in operation, as tested against the factors set forth in the Maryland Lawyers' Rules of Professional Conduct Rule 1.5(a). *Attorney Grievance Comm'n v. Pennington*, 355 Md. 61, 74, 733 A.2d 1029 (1999) (*"Korotki* teaches ... that an agreement, reasonable when made, may become unreasonable in light of changed facts and circumstances. Thus, as *Korotki* points out, ... the question of the reasonableness of a contingent fee agreement, or one with contingent features, must be revisited after the fee is quantified or quantifiable and tested by the factors enumerated in Rule 1.5(a).") (citing *Korotki*, 318 Md. at 664–65, 569 A.2d 1224) (citations omitted). As the Supreme Court of Arizona has stated, and the Court of Appeals cited with approval in *Korotki*, 318 Md. at 664–65, 569 A.2d 1224,

> We do not believe ... that recognition of the propriety of the initial fee arrangement gives the lawyer carte blanche to charge the agreed percentage regardless of the circumstances which eventually develop. Either a fixed or contingent fee, proper when contracted for, may later turn out to be excessive. We realize that business contracts may be

enforced between those in equal bargaining capacities, even though they turn out to be unfair, inequitable or harsh. However, a fee agreement between lawyer and client is not an ordinary business contract. The profession has both an obligation of public service and duties to clients which transcend ordinary business relationships *and prohibit the lawyer from taking advantage of the client.*

*In re Swartz,* 141 Ariz. 266, 686 P.2d 1236, 1243 (1984) (citations omitted) (emphasis added). The evidence supports a finding that the here was unreasonable, both at its inception and after it was quantified.

## A

### Unreasonableness at Inception

The court below found the fee to be unreasonable at its inception under reasoning similar to that set forth *supra* to show appellants failed to make full disclosure when the fee agreement was negotiated, namely that appellants failed to communicate appellees' reasonable exposure to liability under the IRS deficiency notices. Although appellants were clearly in a position to ascertain that exposure, the court found, they instead based the fee agreement upon the government's inflated claim, which in turn, unreasonably inflated the potential fee. To support this conclusion, the court cited the following findings of fact, which it made based in large part on undisputed testimony:

i. Brown himself testified that from the time that representation began, he believed that the government valuation of the farm was "entirely too high." He also knew that the Tax Court worked "like a condemnation jury; they split the difference and compromise."[23]

---

23. Given this testimony, we find it somewhat disingenuous that appellants now argue, in an attempt to discredit Commissioner Cohen's testimony regarding "water" in the deficiency notice, that a deficiency notice is tantamount to finality: "A statutory tax deficiency assessment constitutes the final word by the IRS, at which time the IRS has the right to begin collection proceedings subject to judicial review."

 ii. Brown clearly knew of fair market value appraisals of the farm ranging from $6.2 million to $24.8 million, sums that were between 60 and 90 percent less than the valuation of $60 million asserted by the IRS.

 iii. In a letter dated August 20, 1990, Sturm stated that he and Brown believed that they could have convinced the Tax Court to accept appraisals in the range of $5 million as a fair market value of the farm in 1982.

Additionally, Commissioner Cohen had testified that attorneys who represent persons before the Tax Court are entitled to view the documents that support government valuation claims. The court found no evidence on the record that appellants sought out such information prior to execution of the retainer agreement. The court's findings of fact thus have solid, indeed undisputed, support in the record. From the chasm that separates what appellants actually knew and what they told their clients, the court below could have with good cause inferred that appellants acted to take advantage of appellees and ignored their obligation to public service.

## B

### Unreasonableness When Quantified

The trial court also found that appellants' fee was unreasonable when it was quantified, *i.e.*, at the time the King children settled with the IRS. We identify no clear error in its finding. To determine the reasonableness of the quantified fee, the court examined that fee under the criteria set forth in the Maryland Lawyers' Rules of Professional Conduct Rule 1.5(a), as *Pennington*, 355 Md. at 74, 733 A.2d 1029, and *Korotki*, 318 Md. at 664–65, 569 A.2d 1224, direct. Its analysis of the facts under each criterion was extensive, and we summarize herein:

 i. As for "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly," *see* Md. R. Prof. Conduct 1.5(a)(1), the court found that appellants, by their own admission, did not keep time records and thus could not estimate the amount of time spent on

appellees' case. In contrast, tax litigator Burton, who charged on an hourly basis, received a fee of $30,000, representing about 240 hours of service. The litigation posed no novel or difficulty questions, even if appellants' substantial skill and knowledge of valuation was important to appellees' efforts to defend against IRS claims.

ii. As for "the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer," *see* R. 1.5(a)(2), the court found that plaintiffs presented no evidence that the representation would preclude them from other employment.

iii. As for "the fee customarily charged in the locality for similar legal services," *see* R. 1.5(a)(3), the court, relying upon Commissioner Cohen's testimony, found that the standard of practice in Tax Court is to use an hourly fee structure, especially if the client requests it. He testified that the largest fee of which he knew was $1.2 million; likewise, Burton stated that his firm's highest fee ever had been $400,000.[24]

iv. As for "the amount involved and the results obtained," *see* R. 1.5(a)(4), the court found that although the amount in controversy had been substantial, a realistic estimate of the King children's exposure was nowhere near as great as the liability claimed by the government. Further, undisputed evidence cited by the court shows that the reduction in valuation ultimately reflected in the final settlement was in no part due to appellants' efforts. Indeed, the IRS changed its valuation in pleadings submitted shortly before the trial after it obtained an independent estimate of the farm's value. The court additionally reminded appellants that

---

**24.** As the court dryly observed, "If [appellants] had worked on the defendants' case an average of six hours a day, five days a week, for the entire 18 month period of representation, their hourly rate for the fee claimed would be $2,056."

any "results" they obtained were of dubious value, for they were personally involved in the ill-advised transfer that led to the tax litigation. Brown had been warned repeatedly by Piper & Marbury's G. Van Velsor Wolf of the tax calamity that might occur, but he and Sturm did nothing to avert the crisis.

v. As for "the time limitations imposed by the client or by the circumstances," *see* R. 1.5(a)(5), the court found that appellants presented no evidence regarding such limitations or circumstances.

vi. As for "the nature and length of the professional relationship with the client," *see* R. 1.5(a)(6), the court found that the lengthy relationship between appellants and the King family was not a factor, except to strengthen its finding that a confidential relationship existed between the parties at the time the retainer agreement was signed.

vii. As for "the experience, reputation, and ability of the lawyer or lawyers performing the services," *see* R. 1.5(a)(7), the court found that although appellants brought unique knowledge of the King farm and extensive valuation experience to the table, they had no experience in trying cases in Tax Court, and in fact, they relied on outside counsel for any real expertise in taxation.

viii. Finally, as for "whether the fee is fixed or contingent," *see* R. 1.5(a)(8), the fee was of the latter type. The court reiterated its finding that appellants acted contrary to Rule 1.5(c) (governing contingent fees) by failing to set the benchmark figure in the retainer agreement based upon appellees' reasonable exposure. The court also restated its finding that the agreement had been coercive in nature, because its contingency terms had been negotiated under appellants' threat of withdrawal months after the representation began.

The court concluded that the fee of $4,810,919.75 was unreasonable because it bore little relation to the time, labor,

novelty and risk of the legal problem—a problem, the court noted, in part *created by appellants*—and further, experienced tax practitioners, including a former Commissioner of Internal Revenue, had testified that such a fee was uncommon in practice. We see no clear error in the court's findings of fact, nor can we criticize the manner in which it applied Rule 1.5(a).

Finally, in *Korotki*, the leading Maryland case on the reasonableness of fees, the Court of Appeals held that the attorney's contingent fee violated not only Maryland's rule against excessive fees but also the prohibitions of Disciplinary Rule 5–103(A) of the former Maryland Code of Professional Responsibility, which prohibited a lawyer from obtaining a proprietary interest in the client's cause of action.[25] The reverse contingency fee arrangement ultimately reached could be construed as appellants' "Plan B" in lieu of the initial proposed agreement giving them an interest in the rents and royalties from the farm. As such, it might tread upon the current counterpart to DR 5–103(A), Rule 1.8(j) of the Maryland Lawyers' Rules of Professional Responsibility.[26] We affirm.

## III

### Collateral Estoppel

On cross-appeal, appellees remind this Court of the decision of the Bankruptcy Court denying appellants' claim against

---

**25.** DR 5–103(A) states:

A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client, except that he may:

(1) Acquire a lien granted by law to secure his fee or expenses.

(2) Contract with a client for a reasonable contingent fee in a civil case.

**26.** Rule 1.8(j) states:

A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may:

(1) acquire a lien granted by law to secure the lawyer's fee or expenses; and

(2) subject to Rule 1.5 contract with a client for a reasonable contingent fee in a civil case.

William King and Field Farms to recover legal fees, and they
raise the issue of collateral estoppel. We affirm the findings
of the court below, which twice denied appellees' motion on
grounds of collateral estoppel.

## A

### Procedural History

The tax litigation forced King and Field Farms into Chapter
11 bankruptcy protection. Appellants brought a claim for fees
that was virtually identical to the claim *sub judice* against the
debtors in Bankruptcy Court. The debtors objected and
asserted separate claims against appellants for legal malprac-
tice, breach of fiduciary equity, fraud, rescission, avoidance of
preferential transfer, equitable subrogation, and civil conspira-
cy. After a bench trial, the Bankruptcy Court rejected all
claims made by both sides.

The court's reasoning, however, was telling. It rejected
outright appellants' claims on the merits, but it declined the
counterclaims made by the debtors on the basis of limitations
and laches, ruling instead that those claims could be pressed
in the form of recoupment against appellants' claim for legal
fees. The court then found that appellants had been negligent
as to the debtors in the underlying sale of the farm,[27] and such
negligence was the proximate cause of the tax litigation. It
assessed damages in the amount of $11 million, an amount far
exceeding the amount claimed by appellants in legal fees and
fully offsetting any fees King and Field Farms might owe.
The court alternatively found that appellants' claim for fees
arose from their own negligent acts, and that fee had been
negotiated even as the lawyers knew that the debtors were in
a precarious position. Finally, the Bankruptcy Court found
that the fee was unreasonable under 11 U.S.C. § 502(b)(4),[28]

---

**27.** In its opinion from the bench, the Bankruptcy Court found King to
be "totally unsophisticated" and opined that appellants "should have
known of his dependence on them in representing him," because
"[t]here were no other attorneys but Brown & Sturm to give advice."

**28.** Section 502(b)(4) states in relevant part:

because appellants already had received pre-petition from the debtor and appellees a sum of $1,637,000, representing interest on its fee. In the court's view, that sum represented sufficient payment for the reasonable value of the firm's services.

Appellants *sub judice* appealed the Bankruptcy Court's decision. In affirming, the United States District Court for the District of Maryland rejected appellants' argument that King and Field Farms had been contributorily negligent or had assumed any risk in the land sale. The court also rebuffed appellants' contention that the debtors could not use malpractice as a basis for set-off or recoupment and upheld the Bankruptcy Court's finding that the fee was unreasonable under section 502(b)(4).

Appellants further appealed to the United States Court of Appeals for the Fourth Circuit, which affirmed the findings of the District Court. In holding that the Bankruptcy Court did not err, the Fourth Circuit, like the courts below, challenged appellants' practices in structuring the original sale and undertaking the tax litigation:

> Brown & Sturm's services in the IRS litigation became necessary because of the questionable way in which the firm structured the sale of the farm. In addition, Brown & Sturm was apparently not sufficiently schooled in tax litigation because it retained the services of Charles Burton as tax expert "to guide them through the tax court . . . and make sure everything was properly prepared."

*Brown & Sturm v. Field Farms Ltd. P'ship* (*In re Field Farms Ltd. P'ship* ), No. 96–2528, 1997 WL 452290, at *3, 1997 U.S.App. LEXIS 21249, at *10 (4th Cir. Aug. 11, 1997). Nevertheless, the court backed away from the Bankruptcy

---

[I]f . . . objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . if such claim is for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services. . . .

Court's malpractice rationale, declined to affirm on the basis of recoupment, and rested its decision solely upon section 502(b)(4):

> We need not address whether the equitable remedy of recoupment was available to William King and Field Farms. Because the bankruptcy court properly disallowed Brown & Sturm's claims pursuant to § 502(b)(4), there are no claims against which to apply recoupment.

*Id.* 1997 WL 452290, at *4, 1997 U.S.App. LEXIS 21249, at 13–14. Neither did the Fourth Circuit endorse the debtors' "other arguments, including those concerning rescission and the recovery of certain transfers to Brown & Sturm made prior to the petition date," for it found them to be "without merit."

Armed with this opinion and anxious to capitalize upon the success of their co-tenants, appellees twice sought to show the court below that appellants' claims were barred by collateral estoppel. In March 1998, Jacobs and the Aschenbach appellants moved to dismiss the case *sub judice* based on collateral estoppel. The court denied their motion from the bench, explaining that

> a finding of negligence was not necessary in order for the federal court to have disallowed the attorney's fees, although there was reference made to it, as I pointed out in reading from Judge Friend's transcript, as well as it I were to simply look at the same recitation at the very end of Subsection 2(a) of the Fourth Circuit's opinion.
>
> They do the same. They call the advice—I think they were very kind—called the advice from Brown & Sturm questionable. I think perhaps Judge Friend [who presided in Bankruptcy Court] found it a lot more than questionable.
>
> But in any event . . . [the Court of Appeals] did throw in the reference to the fact that [Burton] charged 30,000 and they charged six million and that they had received two million, et cetera.
>
> So, I think there were certainly enough bases upon which the Fourth Circuit and Judge Friend could have found and

determined that this was an unreasonable fee without reference to negligence or non-negligence of the law firm.

And for that reason, as I read, among others, *Murray International v. Graham*[, 315 Md. 543, 555 A.2d 502 (1989),] from our Court of Appeals, it was not necessary to have found negligence in order to arrive at the decision that was arrived at.

Consequently, collateral estoppel does not apply. . . .

The court later denied appellees' summary judgment motion made in part on collateral estoppel grounds, explaining that the Fourth Circuit's unwillingness to allow recoupment mooted that issue and made it non-essential to the final judgment of the Bankruptcy Court. Likewise, the court also noted, the issue of duress had never actually arisen in Bankruptcy Court, much less formed the basis for the final judgment there. Finally, the court stated, the standard of reasonableness for evaluating a claim for attorney's fees under federal bankruptcy law is "quite different from Rule 1.5(a) of the Maryland Lawyers['] Rules of Professional Conduct," which is based on the common law of Maryland. Because appellees made their arguments in the case *sub judice* based upon the latter standard rather than the former one—indeed, factual findings regarding the reasonableness of appellants' fee under Rule 1.5(a) were incomplete at the time of the motion—the court below declined to grant summary judgment on the basis of collateral estoppel.[29] We agree.

---

**29.** The court, we note, based its judgment after the trial upon of one appellees' three original contentions, that a confidential relationship existed between the parties, and it addressed Rule 1.5(a) in that context. It made *no* findings regarding the applicability of the seven additional factors set forth in *Post*, 349 Md. at 142, 707 A.2d 806, and *Son*, 349 Md. at 441, 709 A.2d 112, and to what extent the equitable remedy described in those cases might be available. Neither did the court express any opinion regarding whether appellees' payment of $1,637,000 to appellants constituted sufficient compensation or whether Brown & Sturm's actions regarding the sale of the King Farm was malpractice.

## B

## Standard of Review

Although one of the motions denied in the trial court was styled as a motion to dismiss, the court nevertheless "looked outside the four corners of the complaint and relied upon the determinations made by" the Bankruptcy Court and the Fourth Circuit "in the prior action." *Deitz v. Palaigos,* 120 Md.App. 380, 393, 707 A.2d 427 (1998); *see also* Md. Rule 2–322(c) ("If, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment. . . ."). As such, we treat both denials in the court below as though that court had in front of it two separate motions for summary judgment, *id.,* and our standard of review is the standard applicable to a denial of a motion for summary judgment. *See Williams v. Montgomery County,* 123 Md. App. 119, 124, 716 A.2d 1100 (1998). We must determine whether the trial court was legally correct. *Id.* at 125, 716 A.2d 1100; *Nationwide Mut. Fire Ins. Co. v. Tufts,* 118 Md.App. 180, 186, 702 A.2d 422 (1997). "In so doing, we review the same material from the record and decide the same legal issues as the circuit court," *id.,* whether the party in whose favor judgment was entered was so entitled as a matter of law. Md. Rule 2–501(e). The trial court, however, may exercise its discretion to deny that motion. " '[A] denial (as distinguished from a grant) of a summary judgment motion, as well as foregoing the ruling on such a motion either temporarily until later in the proceedings or for resolution by trial of the general issue, involves not only pure legal questions but also an exercise of discretion as to whether the decision should be postponed until it can be supported by a complete factual record.' " *Presbyterian Univ. Hosp. v. Wilson,* 99 Md.App. 305, 312–13, 637 A.2d 486 (1994) (quoting *Metropolitan Mtge. Fund, Inc. v. Basiliko,* 288 Md. 25, 28–29, 415 A.2d 582 (1980)), *aff'd,* 337 Md. 541, 654 A.2d 1324 (1995). Absent clear

abuse of discretion, we will not disturb the trial court's exercise of discretion on appeal. *Id.*

## C

## Law of Collateral Estoppel

 Collateral estoppel bars a party from re-litigating any issue of fact or law conclusively determined against that party in previous litigation. In one of Maryland's recent cases on collateral estoppel, we reiterated the four elements that the party claiming estoppel must establish:

i. Was there a final judgment on the merits in the prior litigation? [30]

ii. Was the party against whom the plea is asserted a party or in privity with the party to the prior adjudication?

iii. Was the issue decided in the prior litigation identical with the issue presented in the subsequent litigation?

iv. Was the issue actually litigated essential to the judgment in the prior action?

*Deitz*, 120 Md.App. at 395, 707 A.2d 427 (citing *Murray Int'l Freight Corp. v. Graham*, 315 Md. 543, 547, 555 A.2d 502 (1989) (quoting Restatement (Second) of Judgments § 27 (1982)); *Pope v. Board of Sch. Comm'rs*, 106 Md.App. 578, 594, 665 A.2d 713 (1995) (citing *MPC, Inc. v. Kenny*, 279 Md. 29, 35, 367 A.2d 486 (1977); *Murray Int'l*, 315 Md. at 550–52, 555 A.2d 502)).

Appellees applied the facts *sub judice* to each element of the collateral estoppel rule. They remind us that the Bankruptcy Court rendered final judgment on the merits for the issues, and that judgment was affirmed on appeal by both the United

---

**30.** Additionally, we noted in *Deitz*, the party against whom the doctrine is asserted must have been given a fair opportunity to appeal the judgment in the prior action. *Id.* (citing *Pope v. Board of Sch. Comm'rs*, 106 Md.App. 578, 594–95, 665 A.2d 713 (1995); Restatement (Second) of Judgments § 28(1) (1982) (designating this element as an exception to the availability of the collateral estoppel doctrine)).

States District Court and the Fourth Circuit. They point out that appellants in this case were the claimants in the bankruptcy action. They explain that both cases involved the same issues, including appellants' malpractice as a defense to the fee claim, the appropriateness of the reverse contingency fee in tax litigation, the circumstances under which appellees and the debtors signed the retainer agreement, and the reasonableness of the quantified fee itself. Finally, they note that the issues in the bankruptcy case were fully litigated during an adversarial proceeding conducted with all the procedural and due process protections normally afforded parties in Maryland courts, and Brown & Sturm was represented by counsel and exercised two opportunities to appeal the court's decision.

### D

### Missing Element of Necessity

Appellees miss, however, the element of essentiality or necessity, which must be present for collateral estoppel to apply. Indeed, the factual determination of the issue upon which collateral estoppel is sought must have been "essential to the judgment" in the prior action. *Deitz,* 120 Md.App. at 396–97, 707 A.2d 427. If such factual determination was not essential to the prior decision—that is, if the trial court could have reached the same disposition by resting its judgment on grounds for which that finding of fact was not required—then collateral estoppel does not apply, even if the court in the later case had before it facts shared with the transaction or occurrence under litigation in the prior proceeding. *Thacker v. City of Hyattsville,* 135 Md.App. 268, 288, 762 A.2d 172 (2000) ("determination of the issue must have been a critical and necessary part of the decision in the prior proceeding") (citing *Sedlack v. Braswell Servs. Group,* 134 F.3d 219, 224 (4th Cir.1998)); *Cassidy v. Board of Educ.,* 316 Md. 50, 62, 557 A.2d 227 (1989) (defining necessity as "essentialness of the determination to the judgment"); *Murray Int'l,* 315 Md. at 551, 555 A.2d 502 (holding that estoppel does not apply to

matters " 'immaterial to the judgment' ") (quoting *LeBrun v. Marcey,* 199 Md. 223, 228, 86 A.2d 512 (1952)).

As the bankruptcy case moved from the trial court to the Fourth Circuit, the foundation upon which the judgment rested narrowed considerably. The Bankruptcy Court's judgment relied on multiple theories, including negligence, recoupment, and reasonableness under the standards of 11 U.S.C. § 502(b)(4). As for the latter ground, the court found that the $1,637,000 already paid as interest on the quantified contingency fee represented sufficient payment for the reasonable value of Brown & Sturm's services and that no additional payments were required. The District of Maryland affirmed this broad finding, but the Fourth Circuit winnowed out the recoupment and negligence rationale and narrowed the basis for judgment to the reasonableness of the fee under the Bankruptcy Code. It also rejected the debtors' equity-based arguments for rescission and recovery of earlier transfers to appellants.

A finding of unreasonableness under the Bankruptcy Code does not rely upon or require findings of fact that would be integral to findings of unreasonableness under the state law standards upon which appellees in the instant case rely. The test for reasonableness under section 502 is unique to bankruptcy proceedings. It allows creditors and other parties who have an interest in the bankruptcy estate to make a claim for that interest, and subsection (b) articulates exceptions that the debtor might claim and the court might find while parceling out those interests. Section 502(b)(4) allows a reasonableness test for both claims brought by attorneys who have represented the debtor in the bankruptcy matter and claims for legal fees covering "for services of an insider or attorney of the debtor" incurred pre-petition for other matters, as in the case *sub judice. In re Field Farms Ltd. P'ship,* 1997 WL 452290, at *2, 1997 U.S.App. LEXIS 21249, at *3 (citing 3 Collier on Bankruptcy ¶ 502.02[5] (15th ed.1996)); *see also* 11 U.S.C. § 329 (2000) (applying to attorney's fees for services in connection with the bankruptcy matter); 2 Collier on Bankruptcy ¶ 329.03 (15th ed.1996) ("when compensation is sought for past

legal services not rendered in contemplation of or in connection with a case under the Code ... the claim does not fall under the purview of section 329").

A finding of unreasonableness under section 502 does not apply to state court proceedings, and it does not affect the enforceability or other liability under state law. *Landsing Diversified Prop. II v. First Nat'l Bank & Trust Co. (In re Western Real Estate Fund, Inc.),* 922 F.2d 592, 597–600 (10th Cir.1990). Whether an attorney's fee claim exceeds the reasonable value of such services under bankruptcy law is "a matter that is plainly beyond the bounds of state court authority or concern." *Id.* at 600; *see also Canal Corp. v. Finnman (In re Johnson ),* 960 F.2d 396, 404 (4th Cir.1992) (holding that the allowance or disallowance of a claim in bankruptcy is a matter of federal law and does not affect the existence of that claim, which is controlled by state law, and the bankruptcy court may deny valid state law claims "under its federal equitable power"). It would be "incongruous," the *Western* court held, in a case quite similar to the one *sub judice,* to use "state attorney's fee standards" in making a determination under section 502(b)(4), because that section relies upon a "federal standard ... regarding the reasonableness of such [fees] in the context of bankruptcy." 922 F.2d at 597.

A recent Maryland bankruptcy decision, *In re Merry–Go–Round Ents.,* 244 B.R. 327 (Bankr.D.Md.2000), further clarifies the distinction between the Bankruptcy Court's analysis of the reasonableness of fees under the Bankruptcy Code[31] and the proper analysis for any equitable defenses to state law claims arising from the same facts. *Merry–Go–Round* clearly states that analysis of reasonableness for defenses to state law claims set forth in the aftermath of *Post,* 349 Md. at 142, 707

---

**31.** The specific section of the code examined in *Merry–Go–Round* is 11 U.S.C. § 328(a) (2000) (limits upon the compensation of professionals, *i.e.,* attorneys, accountants, appraisers and others, employed to assist trustee with administration of the bankruptcy estate); nevertheless, we believe the broader policy considerations governing the Bankruptcy Code allow the case to apply here.

A.2d 806, requires that the Bankruptcy Court engage in an analysis under Maryland rules and cases which is separate and distinct from that performed pursuant to the Bankruptcy Code. 244 B.R. at 338–41 (rejecting post-quantification claim that contingency fee agreement approved under 11 U.S.C. § 328(a) was unreasonable under the Maryland Lawyers' Rules of Professional Conduct).

In conclusion, rather than analyze the legality of a given claim under state law, the Bankruptcy Court under section 502(b)(4) reviews "the reasonableness of such charges *in the context of bankruptcy.*" *Western,* 922 F.2d at 597. It limits the sum available to the attorney from the bankruptcy estate so that all creditors may be treated equitably, which is a strong policy consideration in the Bankruptcy Code.[32] In some circumstances, the attorney might be free to pursue the balance of his unpaid fee in state court proceedings against co-obligors who are not in bankruptcy. *Id.* at 600 ("Obviously, it is the debtor, who has invoked and submitted to the bankruptcy process, that is entitled to its protections; Congress did not intend to extend such benefits to third-party bystanders.... 'What is important to keep in mind is that a discharge in bankruptcy does not extinguish the debt itself but merely releases the debtor from personal liability.... The debt still exists, however, and can be collected from any other entity that may be liable.' ") (quoting *In re Lembke,* 93 B.R. 701, 702 (Bankr.D.N.D.1988)). The only finding that the Bankruptcy Court must make under section 502(b)(4) is whether the attorney claimant has already been paid sufficient monies. *See Western,* 922 F.2d at 597–98.

 Against this background, the weakness of appellees' position shows up in stark relief. After appellate review, the final judgment in the bankruptcy action rested *only* upon a

---

32. Appellants point out that section 502(b)(4) is often invoked by a competing creditor or committee of creditors, or by the bankruptcy trustee acting on behalf of the creditors, even when the debtor has no objection to attorney's fees, to prevent a single attorney-creditor from receiving a disproportionately large share of the bankruptcy estate.

finding that Brown & Sturm's fee was unreasonable vis-a-vis the claims of other creditors in bankruptcy. The Fourth Circuit declined to affirm the findings of the Bankruptcy Court that were based upon the state law of malpractice and recoupment, and indeed, the Bankruptcy Court need not make such findings of fact to undergird its judgment that the fee was unreasonable under section 502(b)(4). In contrast, *each* of the claims made by appellees in the action *sub judice, see supra* note 2, required the court to evaluate the unreasonableness of the fee under state law standards governing the conduct of Maryland lawyers—whether appellants had committed legal malpractice, inflicting damages greater than their fee claim; whether the fee was unreasonable and excessive under the Maryland Lawyers' Rules of Professional Conduct and thus defeated by appellees' equitable defenses; and whether the fee agreement had been negotiated within the constraints of a confidential relationship. As bankruptcy cases like *Western* show, the federal bankruptcy standard of reasonableness does not take into account the related state law findings, if any, regarding the lawyer's professional conduct. Appellees' collateral estoppel analysis thus fails to establish the element of necessity, and we affirm the trial court's application of the law.

## IV

### Reasonableness of the Fee

■ Finally, appellees argue that the court below failed to find that the fee was unreasonable as a matter of law, and thus subject to equitable defenses under the rule of *Post,* 349 Md. at 142, 707 A.2d 806, and *Son,* 349 Md. at 441, 709 A.2d 112. The trial court's findings of fact, appellees aver, establish their equitable defense in the face of appellants' claim. In its memorandum opinion, the court declined to address any grounds other than the one it found dispositive. We find no error, for as a general rule, a trial court does not err in "limiting its finding to the question" that was dispositive of a case, and determining that "it had no need to address the

other" issues. *Murphy v. 24th Street Cadillac,* 353 Md. 480, 505, 727 A.2d 915 (1999). Appellees attained complete relief from the trial court's decision, and we decline to add to or subtract from the same.

To be sure, appellees in the case *sub judice* raised a persuasive defense regarding the reasonableness of the fee. The court, in its handling of the dispositive issue, set forth facts supporting its careful analysis establishing the unreasonableness of appellants' fee under the factors in the Maryland Lawyers' Rules of Professional Conduct Rule 1.5(a). That analysis would have been the foundation of any further analysis regarding the equitable defenses available to appellees under the rule of *Post,* 349 Md. at 142, 707 A.2d 806, and *Son,* 349 Md. at 441, 709 A.2d 112, had the court pursued that theory. The court did not, however, tease out any additional facts that would have supported equitable defenses, and even if it had, whether to apply those defenses was within its sound discretion.

A finding that a fee is unreasonable under Rule 1.5(a) is merely a first step in establishing whether equitable defenses apply. Even if a fee is "clear[ly] and flagrant[ly]" unreasonable under our Lawyers' Rules of Professional Conduct, *Post,* 349 Md. at 168, 707 A.2d 806, such a violation does not trigger a *per se* defense, automatically rendering the fee agreement invalid and unenforceable in whole or in part. *Id.* at 168, 707 A.2d 806; *Son,* 349 Md. at 461, 709 A.2d 112.[33] Instead, the trier of fact must next consider and "look to all the circumstances," making appropriate findings of fact based upon the following elements:

 i. The nature of the alleged violation;

 ii. the source and history of the violation;

iii. the extent to which the parties acted in good faith;

---

**33.** Indeed, the Court of Appeals "highlight[ed] the word 'may' for a reason" when it set forth the equitable defense. *Post,* 349 Md. at 168, 707 A.2d 806.

 iv. whether the defendant's shares culpability, and whether he raised the defense to escape an otherwise valid contractual obligation;

 v. whether the violation has some particular public importance, such that there is a public interest in no enforcing the agreement;

 vi. whether the client would be harmed by enforcing the agreement and to what extent, if the agreement violates the Rules of Professional Conduct, the fee is unreasonable; and

 vii. any other relevant considerations.

*Post,* 349 Md. at 169–70, 707 A.2d 806.

 Even so, "an equitable defense in a contract suit does not render the contract void but merely unenforceable at law." *Goldman, Skeen & Wadler, P.A. v. Cooper, Beckman & Tuerk, L.L.P.,* 122 Md.App. 29, 43, 712 A.2d 1 (1998) (citing *Creamer v. Helferstay,* 294 Md. 107, 113–15, 448 A.2d 332 (1982)). The factors set forth for use in determining whether the defense is available, instead, call upon a court to exercise its equitable discretion, and indeed the court may bar such a defense if the equities call for such a limitation. *Id.* at 43–44, 712 A.2d 1. In making such a findings, the court may exercise "the fullest breadth of its discretion." *Id.* at 45, 712 A.2d 1.

Likewise, we think that the court's broad discretion also applies when it refrains to reach the issue of equitable defenses, and our standard of review, moreover, limits our inquiry to whether the trial court's findings of fact had sufficient basis in the evidence, and whether the court erred in applying the law. *Bowers,* 240 Md. at 627, 214 A.2d 924. Here, appropriate findings of fact are absent from the record, and the court refrained from applying the law, as was its prerogative. We affirm.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**